**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| COSMO TECHNOLOGIES LIMITED, VALEANT PHARMACEUTICALS INTERNATIONAL, and VALEANT PHARMACEUTICALS LUXEMBOURG S.À R.L., ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | C.A. No. 15-116 (LPS) |
| v. ) ) | |
| PAR PHARMACEUTICAL, INC., ) ) ) | |
| Defendant. ) | |
| COSMO TECHNOLOGIES LIMITED, VALEANT PHARMACEUTICALS INTERNATIONAL, and VALEANT PHARMACEUTICALS LUXEMBOURG S.À R.L., ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | C.A. No. 15-164 (LPS) |
| v. ) ) | |
| ACTAVIS LABORATORIES FL, INC., ) ) ) | |
| Defendant. ) | |
| COSMO TECHNOLOGIES LIMITED, VALEANT PHARMACEUTICALS INTERNATIONAL, and VALEANT PHARMACEUTICALS LUXEMBOURG S.À R.L., ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | C.A. No. 15-193 (LPS) |
| v. ) ) | |
| ALVOGEN PINE BROOK, LLC, ) ) ) | |
| Defendant. ) | |

**REBUTTAL DECLARATION OF PROFESSOR STANLEY S. DAVIS**

I, Professor Stanley S. Davis, declare as follows:

I.    QUALIFICATIONS

1.    I was the Lord Trent Professor of Pharmacy at the University of Nottingham from 1975 until 2003.  Since 2003, I have been an Emeritus Professor of Pharmacy at the University of Nottingham.  At Nottingham, I ran a large research group studying novel drug delivery systems.  Our topics of research included drug targeting, transmucosal delivery, oral and parenteral systems for controlled release, and product evaluation through gamma scintigraphy.

2.    I earned a Bachelor's degree in Pharmacy from the School of Pharmacy at the University of London in 1964.  I continued my studies at the University of London and earned a Ph.D. in colloid science in 1967, as well as a Doctor of Science degree (higher doctorate) in 1982.  In 1968, I was awarded a one year Fulbright Scholarship to undertake postdoctoral studies with Professor Takeru Higuchi at the University of Kansas.

3.    In 1966, I was appointed Assistant Lecturer in Pharmaceutics and then to Lecturer in 1967.  In 1970, I moved to the University of Aston in Birmingham as Senior Lecturer and Head of the Pharmaceutics section, where I built up an active research group in drug delivery systems.

4.    I have published approximately 800 scientific papers concerning numerous topics in the pharmaceutical sciences, including controlled-release dosage forms and various aspects of drug delivery to the colon.  I am also a co-editor of seven books relating to pharmaceutical sciences.

5.    I have served on the editorial boards of various scientific journals, including *Pharmaceutical Research*, *Advanced Drug Delivery Reviews*, *International Journal of Pharmaceutics*, *Biomaterials*, *Journal of Pharmacy and Pharmacology*, *Critical Reviews in*

*Therapeutic Drug Carriers*, *Journal of Drug Targeting*, *American Journal of Drug Delivery*, *Pharmaceutical Development Technology*, *Journal of Microencapsulation*, and *Journal of Controlled Release*.

6.      I have been a member of many learned societies, including the Royal Pharmaceutical Society, the Royal Institute of Chemistry, the Society of Rheology, the Society of Chemical Industry, the American Association of Pharmaceutical Scientists, the Controlled Release Society, and the Society for Drug Research.  I have also served on numerous committees and panels including the British and European Pharmacopoeia, the Medicines Commission (United Kingdom), and the Science & Engineering Research Council (United Kingdom).

7.      In addition to my academic experience, I have extensive experience in the pharmaceutical industry.  I am the co-founder of three pharmaceutical companies: CDD (co-ordinated drug delivery) (now Vectura Ltd.); Danbiosyst (UK) Ltd. (sold to West Pharmaceutical Services and then to Archimedes); and Pharmaceutical Profiles Ltd.  I have also acted as a consultant to various pharmaceutical companies in the United States, Europe, and Japan, and have worked as a visiting scientist in the United States at Syntex, Allergan, and Alza.

8.      I have received numerous awards and recognition for my work, including the Science Award (British Pharmaceutical Conference, 1971), the Scheele Award (Swedish Pharmaceutical Association, 1985), the Maurice-Marie Janot Award (APGI, France, 1986), the Harrison Memorial Medal (Royal Pharmaceutical Society, 2000), and the Host Madsen Medal (FIP, International Pharmaceutical Federation, 2005).  In 2008, I was awarded an honorary doctor of science degree from London University.  In 2003, I received the Eurand Career Achievement Award for Outstanding Research in Oral Drug Delivery from the Controlled

Release Society.  In 2010, I was made a Fellow of the Controlled Release Society.  In 2013, I was made a Fellow of University College, London.

9.     My most current *curriculum vitae* is attached as Exhibit 1,[1] which lists my publications and the cases in which I have testified as an expert at trial or by deposition in the last 4 years.  I am being compensated at my standard rate of £500.00 per hour for time spent working as an expert consultant on this matter.

## II.    SCOPE OF DECLARATION

10.     I have been asked by counsel for Plaintiffs Cosmo Technologies Limited, Valeant Pharmaceuticals International, and Valeant Pharmaceuticals Luxembourg S.à r.l. to consider the proposed constructions for certain claim terms from U.S. Patent No. 7,410,651 ("the '651 patent," Ex. 2), U.S. Patent No. RE 43,799 ("the '799 patent," Ex. 3), U.S. Patent No. 8,784,888 ("the '888 patent," Ex. 4), U.S. Patent No. 8,293,273 ("the '273 patent," Ex. 5), U.S. Patent No. 7,431,943 ("the '943 patent," Ex. 6), and U.S. Patent No. 8,895,064 ("the '064 patent," Ex. 7) (collectively, "the patents-in-suit") and the opinions of Jason T. McConville, expressed in his declaration dated January 28, 2016 ("McConville Decl."), regarding those terms.

11.     I have reviewed the patents-in-suit and their prosecution histories, as well as the defendants' opening claim construction brief, the declaration of Jason T. McConville, dated January 28, 2016, and the exhibits cited in those documents.

## III.   THE ASSERTED PATENTS

12.     The patents-in-suit are entitled "Controlled Release and Taste Masking Oral Pharmaceutical Composition" and are directed to controlled-release pharmaceutical

---

[1] Exhibits to this declaration are designated "Exhibit" or "Ex. __."  I understand that exhibits prefaced by a D.I. number, also designated "Ex. __," refer to the documents as they have been filed in C.A. No. 15-116-LPS.

compositions.  *See, e.g.*, Ex. 3, '799 patent, 1:19-24 ("The present invention relates to controlled release and taste masking compositions containing budesonide as active ingredient incorporated in a three-component matrix structure, i.e. a structure formed by successive amphiphilic, lipophilic or inert matrices and finally incorporated or dispersed in hydrophilic matrices."); *id.* at 2:60-3:3 ("The invention provides controlled release and taste masking oral pharmaceutical compositions containing as active ingredient budesonide comprising: a) a matrix consisting of lipophilic compounds with melting point lower than 90[deg.] C. and optionally by amphiphilic compounds in which the active ingredient is at least partially incorporated; b) an amphiphilic matrix; c) an outer hydrophilic matrix in which the lipophilic matrix and the amphiphilic matrix are dispersed; d) optionally other excipients.").[2]

13.     Several of the patents, specifically the '651, '799, and '943 patents, describe the claimed invention in terms of multiple matrices.  Claim 1 of the '799 patent is reproduced below by way of example.

1. A controlled release and taste-masking oral pharmaceutical composition comprising:

budesonide as an active ingredient incorporated into a matrix structure consisting essentially of:

a) a lipophilic matrix consisting of lipophilic compounds with a melting point between 40° C. and 90° C. in which the active ingredient is at least partially inglobated;

b) an amphiphilic matrix;

c) an outer hydrophilic matrix consisting of hydrogels in which the lipophilic matrix and the amphiphilic matrix are dispersed; and

a gastro-resistant coating wherein the active ingredient is dispersed both in the hydrophilic matrix and in the lipophilic/amphiphilic

---

[2] For the purposes of this declaration, and because the patents-in-suit contain overlapping descriptions, exemplary citations are generally given with reference to the '799 patent.  If the claim term at issue appears only in a specific patent, that patent is generally cited instead.

matrix, and the composition is in the form of tablets, capsules or minitablets.

14.     Some of the other patents, specifically the '888, '273, and '064 patents, do not claim matrices, but instead claim, among other things, types of excipients or specific excipients in a particular type of formulation.  Claim 1 of the '888 patent is reproduced below by way of example.

> 1. A controlled release oral pharmaceutical composition consisting essentially of:
>
> (1) a tablet core consisting essentially of:
>
> a) budesonide in an amount effective to treat intestinal inflammatory disease; and
>
> b) a macroscopically homogeneous composition comprising at least one lipophilic excipient, at least one amphiphilic excipient, and at least one hydrogel-forming hydrophilic excipient other than a gum, wherein said budesonide is dispersed in said macroscopically homogeneous composition; and
>
> (2) a coating on said tablet core, said coating consisting essentially of a gastro-resistant film.

15.     The patents-in-suit provide examples of different lipophilic, hydrophilic, and amphiphilic matrix formers or excipients.  With respect to the lipophilic components, the patents-in-suit state, for example: "The lipophilic matrix consists of substances selected from unsaturated or hydrogenated alcohols or fatty acids, salts, esters or amides thereof, fatty acids mono-, di- or triglycerides, the polyethoxylated derivatives thereof, waxes, ceramides, cholesterol derivatives or mixtures thereof having melting point within the range of 40 to 90° C., preferably from 60 to 70 C." *See, e.g.*, Ex. 3, '799 patent, 3:60-66.  I note that these substances in the context of pharmaceutical formulations are not necessarily pure crystalline substances, and may in fact be impure or mixtures.  With respect to the hydrophilic components, the patents-in-suit state, for example: "The hydrophilic matrix consists of excipients known as hydrogels . . . .

Examples of hydrogels which can be used according to the invention are compounds selected from acrylic or methacrylic acid polymers or copolymers, alkylvinyl polymers, hydroxyalkyl celluloses, carboxyalkyl celluloses, polysaccharides, dextrins, pectins, starches and derivatives, natural or synthetic gums, alginic acid." *See, e.g.*, Ex. 3, '799 patent, 4:28-29, 34-39.  With respect to the amphiphilic components, the patents-in-suit state, for example: "The amphiphilic compounds which can be used according to the invention comprise polar lipids of type I or II (lecithin, phosphatidylcholine, phosphatidylethanolainine [*sic*]), ceramides, glycol alkyl ethers such as diethylene glycol monomethyl ether (Transcutol®)." *See, e.g.*, Ex. 3, '799 patent, 3:55-60.

16.     The patents-in-suit also contain a number of different examples, describing various pharmaceutical compositions and ways of making them.

## IV.     PRINCIPLES OF CLAIM CONSTRUCTION, DEFINITENESS, AND THE LEVEL OF SKILL IN THE ART

17.     I understand that patent claim terms are to be given their plain and ordinary meaning as understood by a person of ordinary skill in the art at the time of the invention, unless the claim terms are defined in a different way by the patentee.  I further understand that claim terms should be interpreted in the context of the claim itself and in view of the patent as a whole, including the specification and the rest of the intrinsic record, such as the prosecution history.

18.     I understand that the prosecution history of a patent may, however, be less helpful for claim construction than the patent claims and the specification.  I further understand that extrinsic evidence, such as dictionaries, other publications, and expert testimony, may be used to aid in the claim construction process, but that extrinsic evidence that is not consistent with the patent documents should be discounted.

19.     I understand that for a patent to satisfy the definiteness requirement, the patent's claims must, when viewed in light of the specification and the prosecution history, inform a person of ordinary skill in the art about the scope of the invention with reasonable certainty.  I further understand that definiteness is assessed from the perspective of a person of ordinary skill in the art at the time the patent was filed.

20.     I understand that Professor Jerry L. Atwood offered a description of the person of ordinary skill in the art in a declaration submitted in connection with the plaintiffs' opening claim construction brief, and for the purposes of this declaration, I have applied that definition: a person of ordinary skill in the art with respect to the patents-at-issue would have a degree in chemistry, pharmaceutical chemistry, pharmacy, medicine, clinical pharmacology, pharmacokinetics, or another pharmaceutical science-related field, and at least three years of experience in designing, developing, evaluating, and/or testing pharmaceutical formulations.  My opinions expressed below regarding the meaning of the disputed claim terms would not change if the level of skill were determined to be somewhat higher or lower.  I note, for example, that Dr. McConville's description of the level of ordinary skill in the art is somewhat different.  My opinions would be the same under either standard.

21.     For the purposes of my analysis, I have considered how the disputed terms of the patents-in-suit would be understood by a person of ordinary skill in the art as of June 1999.  However, my opinions would not change if I considered a somewhat earlier or later time period.[3]

---

[3] I understand that the '064 patent has a later priority date.

## V.    OPINION

### A.    "matrix"

22.    The term "matrix" is used in claims 1-4 and 6-9 of the '651 patent, claims 1-7 of the '799 patent, and claims 1, 4, and 13 of the '943 patent.  The defendants and Dr. McConville have proposed that "matrix" should be construed as "a homogeneous structure in all its volume in which an ingredient or ingredients are dispersed."  *See, e.g.*, McConville Decl. ¶ 52.  In my opinion, there are at least two problems with that proposed construction.  First, it does not include the word "macroscopically," which a person of ordinary skill in the art would see was used as part of the meaning of "matrix" in the patents-in-suit.  Second, it adds the unnecessary requirement that "an ingredient or ingredients" are dispersed in the matrix.

23.    The specifications of the patents-in-suit state: "The compression of the mixture of lipophilic and/or amphiphilic matrix, hydrogel-forming compound and, optionally, active ingredient not inglobated in the lipophilic matrix, yields a macroscopically homogeneous structure in all its volume, namely a matrix containing a dispersion of the lipophilic granules in a hydrophilic matrix."  Ex. 3, '799 patent, 4:50-56.  This would indicate to a person of ordinary skill in the art that the claimed matrices were "***macroscopically*** homogeneous."

24.    Dr. McConville opines that it was known to use matrices in controlled release formulations and that to accomplish the controlled release, something must be dispersed within the matrix.  *See* McConville Decl. ¶¶ 44, 49.  He then cites various portions of the specifications and prosecution histories of the patents-in-suit to argue that the claim term "matrix" must itself be interpreted as "a structure in which another ingredient or ingredients are dispersed."  *See* McConville Decl. ¶¶ 45-48.  I do not believe that a person of ordinary skill in the art would conclude from this that the claim term "matrix" itself as used in the patents-in-suit

requires the additional wording of "in which another ingredient or ingredients are dispersed."

My conclusion is based on the claim language, the specifications, and the prosecution histories.

25.     As can be seen from the emphasized claim language shown below in claim 1 of the '651 patent and claim 1 of the '799 patent, the claims separately describe the relationship of the active ingredient and the matrices, and how the matrices are related.

> '651 patent, claim 1. A controlled release oral pharmaceutical composition ***containing budesonide as active ingredient*** consisting essentially of:
>
> a) ***a lipophilic matrix*** consisting of lipophilic compounds with a melting point between 40° C. and 90 C. ***in which the active ingredient is at least partially inglobated***;
>
> b) an amphiphilic matrix;
>
> c) ***an outer hydrophilic matrix*** consisting of hydrogel forming compounds ***in which the lipophilic matrix and the amphiphilic matrix are dispersed***, wherein the combination of the matrices from a), b), and c) provides controlled release.

* * * * *

> '799 patent, claim 1. A controlled release and taste-masking oral pharmaceutical composition comprising:
>
> ***budesonide as an active ingredient incorporated into a matrix structure*** consisting essentially of:
>
> a) ***a lipophilic matrix*** consisting of lipophilic compounds with a melting point between 40° C. and 90° C. ***in which the active ingredient is at least partially inglobated***;
>
> b) an amphiphilic matrix;
>
> c) ***an outer hydrophilic matrix*** consisting of hydrogels ***in which the lipophilic matrix and the amphiphilic matrix are dispersed***; and
>
> a gastro-resistant coating wherein ***the active ingredient is dispersed both in the hydrophilic matrix and in the lipophilic/amphiphilic matrix***, and the composition is in the form of tablets, capsules or minitablets.

Taking claim 1 of the '651 patent as an example, in addition to claiming three matrices, it states that the active ingredient is incorporated into the lipophilic matrix. It further states that the lipophilic and amphiphilic matrices are dispersed in the hydrophilic matrix. In light of these additional limitations, and similar limitations in the '799 patent, a person of ordinary skill in the art would understand that it is not appropriate to force into the interpretation of the term "matrix" a requirement that an "ingredient or ingredients" be dispersed within that particular matrix.

26.     As noted above (see paragraph 23), the specifications provide evidence that "matrix" is used to mean "a macroscopically homogeneous structure in all its volume." The fact that the sentence continues on to state what the matrix contains ("containing a dispersion of the lipophilic granules in a hydrophilic matrix," Ex. 3, '799 patent, 4:55-56) suggests that the patentees did not define "matrix" itself as having some particular ingredient or ingredients dispersed within it. Moreover, if a substance must be dispersed in a "matrix," it would not be limited to an "ingredient or ingredients."

27.     I am also aware that during prosecution of other patents in this patent family, the patentees stated that "the term 'matrix' is a term known in the art and refers to a macroscopically homogeneous structure in all its volume." Ex. 8, Appl. No. 13/249,839, Amendment, dated 21 February 2013, at 7; Ex. 9, Appl. No. 13/249,839, Amendment After Final, dated 29 April 2013, at 44. These parts of the patent family prosecution history are consistent with my opinions about how a person of ordinary skill in the art would understand the term "matrix" as used in the patents-in-suit. And the portions of the prosecution histories cited by Dr. McConville do not convince me that the patentees used a different meaning of the term "matrix."

28.     Finally, I do not believe that a person of ordinary skill in the art would find the definitions and descriptions of matrices relied upon by Dr. McConville to be helpful in understanding the term "matrix" as used in the patents-in-suit.  Dr. McConville cites the *Dictionary of Pharmacy* definition of matrix: "an insoluble polymer used to entrap a drug in a solid dosage form so that its release can be controlled."  *See* McConville Decl. ¶ 50; D.I. 71-3, Ex. 15 at 186.  But this is not discussing a three-matrix system, let alone the system of the patents-in-suit.  And, applied to the patents-in-suit, this definition is problematic for a number of reasons.  First, many of the matrix-forming materials specifically identified by the patents-in-suit are soluble.  For example, hydroxypropyl cellulose, which is an exemplary hydroxyalkyl cellulose (hydrophilic matrix component), is in fact "freely soluble in water."  Ex. 10, *Handbook of Pharmaceutical Excipients*, at 224 (2d ed. 1994).  Second, many of the matrix-forming materials of the patents-in-suit are not polymers at all.  For example, stearic acid, which is an exemplary fatty acid (lipophilic matrix component), is a monomer.  Given these inconsistencies between a definition of "matrix" found in the *Dictionary of Pharmacy* and the technology described in the patents-in-suit, a person of ordinary skill in the art would not rely on this definition.

29.     Similarly, a person of ordinary skill in the art would be reluctant to define "matrix" as used in the patents-in-suit with reference to the statement cited by Dr. McConville (*see* McConville Decl. ¶ 51) in *Sustained and Controlled Release Drug Delivery Systems*, because that statement is from a chapter on ***physical implants***, not ***oral formulations***, which are covered in a different chapter.  *See* Ex. 11, *Sustained and Controlled Release Drug Delivery Systems*, at pages v-vi (1978) (chapter 3 covers oral and parenteral dosage forms; chapter 4 covers implants, and contains the discussion of matrices cited by Dr. McConville); D.I. 71-4, Ex.

18 at 230.  Further, as in the *Dictionary of Pharmacy*, the matrix is described with reference to polymers.  *See* McConville Decl. ¶ 51 & D.I. 71-4, Ex. 18 at 230 ("In this type of drug delivery system, the drug species is homogeneously dispersed as solid crystals or powder particles **in a matrix formed by the cross-linking of linear polymer chains.**") (emphasis added).  As can be seen from the quoted language, the statement cited by Dr. McConville concerns a specific type of matrix structure—"the cross-linking of linear polymer chains"—that would not create a definition for the different possible matrices disclosed in the patents-in-suit.

30.     I also question the applicability of the definitions of "matrix" from *Dorland's Medical Dictionary* and the *PDR Medical Dictionary* in the context of the patents-in-suit.  *See* McConville Decl. ¶ 51 & D.I. 71-4, Exs. 16-17.  *Dorland's* defines "matrix," in the portion cited by Dr. McConville, by stating: "in a composite restorative resin, the continuous phase (an organic polymer) in which the discrete particles of filler are dispersed."  D.I. 71-4, Ex. 16 at 987.  As with the descriptions from the *Dictionary of Pharmacy* and *Sustained and Controlled Release Drug Delivery Systems*, this definition is problematic because it defines the term specifically with reference to "polymers."  I note also that it refers to "particles of filler," not an ingredient or ingredients.  But even more importantly, this definition applies to "composite restorative resins," whereas the patents-in-suit concern controlled-release oral dosage forms—a different technology.  I note that *Dorland's* makes clear that such resins are inapplicable to the patents-in-suit when it defines a "composite resin" as "a synthetic resin, usually acrylic based, to which a high percentage (about 75 to 80 per cent) of an inert filler has been added; glass beads or rods, borosilicate glass powder, and natural silica are the most commonly used fillers.  Filler particles are coated with a coupling agent that binds the particles to the resin matrix.  **Used chiefly in dental restorative procedures.**"  Ex. 12, *Dorland's*

*Illustrated Medical Dictionary*, at 1449 (27th ed. 1988) (emphasis added).  The *PDR Medical Dictionary* contains five definitions of "matrix."  Dr. McConville quotes the third, which states in its entirety: "A surrounding substance within which something is contained or embedded, *e.g.*, the fatty tissue in which blood vessels or lymph nodes lie; provides a matrix for these embedded structures."  D.I. 71-4, Ex. 17 at 1070.  Given the example provided, and the fact that the other four definitions are unrelated to pharmaceutical formulations, a person of ordinary skill in the art would be unlikely to rely on this wording to create a definition for "matrix" as used in the patents-in-suit.

31.     Accordingly, I do not believe that the term "matrix" as used in the patents-in-suit would be understood by a person of ordinary skill in the art to mean "a homogeneous structure in all its volume in which an ingredient or ingredients are dispersed."  Rather, the plain meaning of "a macroscopically homogeneous structure in all its volume" is more consistent with how the patents-in-suit use the term "matrix."

**B.      "outer hydrophilic matrix"**

32.      The term "outer hydrophilic matrix" appears in claim 1 of the '651 patent and claim 1 of the '799 patent.

33.     As Dr. McConville notes, the parties agree that "hydrophilic" means *affinity for water*.  This is consistent with how a person of ordinary skill in the art would understand that term.  However, as explained below, I disagree with Dr. McConville's opinions that it is appropriate to interpret "outer hydrophilic matrix" as (a) having the "overall property" of an affinity for water and (b) requiring "separate, inner matrices" that it is "located outside" of. *See, e.g.*, McConville Decl. ¶¶ 55-56.

34.     A person of ordinary skill in the art would understand the plaintiffs' proposed construction—"a matrix with an affinity for water within which other matrices are

incorporated"—to require that the matrix itself is hydrophilic. This is consistent with the claim language, where "hydrophilic" modifies "matrix." However, adding additional language to this interpretation, as the defendants and Dr. McConville propose with the phrase "overall property," is unnecessary and redundant, and does not bring further clarity to the meaning of this term. Further, the fact that the hydrophilic matrices described by the patents-in-suit are made up of hydrophilic substances (*see, e.g.*, Ex. 3, '799 patent, 4:28-43; Examples 1-4), simply means that the hydrophilic matrix itself has an affinity for water.

35. Regarding the word "outer" in the term "outer hydrophilic matrix," Dr. McConville acknowledges that the plaintiffs' construction reflects the fact that there are other inner matrices, *e.g.*, the lipophilic matrix and amphiphilic matrix, ***within it.*** *See* McConville Decl. ¶ 58.

36. I do not believe that adding another requirement that the hydrophilic matrix "is located outside separate, inner matrices" clarifies the term further. This requirement is ambiguous because it is unclear whether the inner matrices must be separate from each other, and what exactly that would mean. It could, for example, conflict with the numbered examples in the specifications. By way of illustration, Examples 3 and 4 from the '799 patent describe mixing the active ingredient (budesonide) with the amphiphilic matrix forming materials (lecithin in Example 3; diethylene glycol monoethyl ether in Example 4) until there is "an homogeneous mixture" or "complete homogenization" (Examples 3 and 4 respectively). The resulting mixtures are then mixed with or dispersed in the lipophilic matrix components (*e.g.*, stearic acid and carnauba wax). Also, because the lipophilic and amphiphilic matrices are dispersed within the hydrophilic matrix, it is unclear in what way they would be separate.

37.     Accordingly, assigning a meaning to the term "outer hydrophilic matrix" of "a matrix with an affinity for water within which other matrices are incorporated" would be consistent with the understanding of a person of ordinary skill in the art.

**C.    "hydrophilic first matrix"**

38.     The term "hydrophilic first matrix" appears in claim 1 of the '943 patent.

39.     For the reasons explained above with respect to "outer hydrophilic matrix," (see paragraph 34), a person of ordinary skill in the art would ***not*** understand the term "hydrophilic first matrix" to require the "overall property" of being hydrophilic.  It would be enough for the matrix itself to be hydrophilic.  The notion of an "***overall*** property" is an unnecessary addition to the claim language and a person of ordinary skill in the art would not find it clarifying.

40.     Because, as Dr. McConville recognizes, the plain meaning of "hydrophilic" is "having an affinity for water," a person of ordinary skill in the art would understand "hydrophilic first matrix" to mean "a matrix with an affinity for water."

**D.    "lipophilic matrix"**

41.     The term "lipophilic matrix" appears in claims 1, 3, 4 and 6 of both the '651 and '799 patents.  In my opinion, the defendants' proposed construction—"a matrix with the overall property of having an affinity for lipids"—is not consistent with how a person of ordinary skill in the art would understand the term after reading the patents-in-suit, and, as explained below, I disagree with Dr. McConville's opinions to the contrary.

42.     For the reasons set forth above with respect to "outer hydrophilic matrix," (see paragraph 34), a person of ordinary skill in the art would not understand the term "lipophilic matrix" to require the "overall property" of lipophilia.  It would be enough for the matrix itself to

be lipophilic. The notion of an "**overall** property" is an unnecessary addition to the claim language and a person of ordinary skill in the art would not find it clarifying.

43. With respect to the meaning of the word "lipophilic," I disagree with Dr. McConville that a person of ordinary skill in the art would understand that term as used in the '651 and '799 patents means "having an affinity for lipids," as proposed by the defendants. *See, e.g.*, McConville Decl. ¶¶ 67-68. My opinion is based on the intrinsic evidence. The specifications define "lipophilia" as a "poor affinity towards aqueous fluids." *See* Ex. 3, '799 patent, 1:44-45. A lipophilic matrix would be characterized by lipophilia. Accordingly, a person of ordinary skill in the art would understand "lipophilic matrix" to mean "a matrix with a poor affinity for aqueous fluids."

44. Other portions of the specifications buttress my conclusion because they use "lipophilic" consistent with this definition. The specifications explain that the amphiphilic component of the disclosed invention may "compensate [for] the lack of affinity of the aqueous solvent with the lipophilic compounds." *Id.* at 2:54-56.

45. I disagree with Dr. McConville's opinion that the specifications' definition of "lipophilia" is actually a definition for an "inert matrix." *See* McConville Decl. ¶ 68. While the definition is provided when discussing inert matrices, it is defining the word "lipophilia," not "inert matrix." A person of ordinary skill in the art would appreciate this fact, and would understand the definition to apply to "lipophilic" as used in the claim term "lipophilic matrix."

46. Because the specifications clearly define "lipophilia" and thus "lipophilic," a person of ordinary skill in the art would not need to consult the general usage and technical dictionaries cited by Dr. McConville, nor would he or she rely on such dictionaries when they define the term "lipophilic" in a way that is different than the patents themselves.

E.    "amphiphilic matrix"

47.    The term "amphiphilic matrix" appears in claims 1 and 2 of the '651 patent, claims 1, 2, and 5 of the '799 patent, and claim 13 of the '943 patent.  I disagree with Dr. McConville's opinions that a person of ordinary skill in the art would understand the term as used in these patents means "a matrix with the overall property of both having an affinity for lipids and having an affinity for water."  *See* McConville Decl. ¶¶ 70-73.

48.    For the reasons set forth above with respect to "outer hydrophilic matrix," (see paragraph 34), a person of ordinary skill in the art would ***not*** understand the term "amphiphilic matrix" to require the "overall property" of being amphiphilic.  The notion of an "***overall*** property" is an unnecessary addition to the claim language and a person of ordinary skill in the art would not find it clarifying.

49.    The defendants' proposed construction introduces other potential ambiguities as well.  Because it refers simply to "a matrix with the overall property of both having an affinity for lipids and having an affinity for water," it could potentially describe a matrix in which none of the constituent components are amphiphilic, but is instead just a combination of hydrophilic and lipophilic substances.

50.    As Dr. McConville notes, the patents describe amphiphilic substances or compounds within the matrix.  *See, e.g.*, McConville Decl. ¶ 72; *see also, e.g.*, Ex. 3, '799 patent, 3:55-60 ("The amphiphilic compounds which can be used according to the invention comprise polar lipids of type I or II (lecithin, phosphatidylcholine, phosphatidylethanolainine [*sic*]), ceramides, glycol alkyl ethers such as diethylene glycol monomethyl ether (Transcutol®)"); 4:4-10 ("An amphiphilic matrix . . . is first prepared by dispersing the active ingredient in a mixture of amphiphilic compounds, such as lecithin, other type II polar lipids, surfactants, or in diethylene glycol monoethyl ether"); claim 5 (identifying specific "amphiphilic compounds" that

- 17 -

may form the claimed "amphiphilic matrix").  Accordingly, a person of ordinary skill in the art

would understand the claimed "amphiphilic matrix" to be made up of amphiphilic substances,

*i.e.*, substances that when added to the formulation have both an affinity for lipids and an affinity

for water.  This is consistent with the plaintiffs' proposed claim construction—"a matrix with

substance(s) that have both an affinity for lipids and an affinity for water."

      **F.**        **"lipophilic/amphiphilic matrix"**

      51.      The term "lipophilic/amphiphilic matrix" appears in claim 1 of the '799

patent.  The complete claim language reads as follows (emphasis added):

> A controlled release and taste-masking oral pharmaceutical
> composition comprising:
>
> budesonide as an active ingredient incorporated into a matrix
> structure consisting essentially of:
>
> a) a lipophilic matrix consisting of lipophilic compounds with a
> melting point between 40° C. and 90° C. in which the active
> ingredient is at least partially inglobated;
>
> b) an amphiphilic matrix;
>
> c) an outer hydrophilic matrix consisting of hydrogels in which the
> lipophilic matrix and the amphiphilic matrix are dispersed; and
>
> a gastro-resistant coating wherein the active ingredient is dispersed
> both in the hydrophilic matrix and in the ***lipophilic/amphiphilic
> matrix***, and the composition is in the form of tablets, capsules or
> minitablets.

      52.      Dr. McConville opines that a person of ordinary skill in the art would not

have reasonable clarity about the meaning of this term and that it is indefinite.  *See* McConville

Decl. ¶¶ 75-76.  I disagree.  I do not see any difficulty for a person of ordinary skill in the art to

understand the meaning.  A person of ordinary skill in the art would understand the term

"lipophilic/amphiphilic matrix" in the context of claim 1 of the '799 patent to mean "lipophilic or

amphiphilic matrix."

53.     I am aware that the symbol "/" may mean "or."  *See* Ex. 13, *The New Merriam-Webster Dictionary*, at 811 (1989) ("virgule": "a mark / used typically to denote 'or'").  As such, the phrase "lipophilic/amphiphilic matrix" would be understood as "lipophilic or amphiphilic matrix," and this makes sense because claim 1 of the '799 patent claims three matrices (the lipophilic matrix, the amphiphilic matrix, and the hydrophilic matrix, which are designated (a), (b), and (c), respectively) and then uses this symbol to refer to the lipophilic matrix and the amphiphilic matrix when they are mentioned together.  In the context of the claims, then, the active ingredient may be dispersed in the lipophilic matrix, the amphiphilic matrix, or both the lipophilic matrix and the amphiphilic matrix.  Thus, in my opinion the scope of the claims of the '799 patent is clear.

54.     This conclusion is bolstered by my interpretation of the specifications, which include descriptions in which the active ingredient is dispersed in the lipophilic matrix, the amphiphilic matrix, or both.  For example, column 4, lines 4-24 of the '799 patent describe two possible embodiments in which the active ingredient is dispersed first in the amphiphilic matrix or first in the lipophilic matrix.  Examples 3 and 4 of the '799 patent describe mixing budesonide with amphiphilic matrix components and then with lipophilic matrix components.  *See* Ex. 3, '799 patent, 7:3-6 (Example 3); 7:35-40 (Example 4: "50 g of diethylene glycol monoethyl ether are homogeneously distributed on 500 g of microcrystalline cellulose; then 100 g of Budesonide are added, mixing to complete homogenization. This mix is further added with 400 g of Budesonide, then dispersed in a blender containing 100 g of carnauba wax and 100 g of stearic acid . . . .").  I thus disagree with Dr. McConville's opinion that the "specification of the patents-in-suit does not resolve the confusion about this term."  *See* McConville Decl. ¶ 77.

## G.       "macroscopically homogeneous composition"

55.     The term "macroscopically homogeneous composition" appears in claim 1 of the '888 patent and claims 1, 3, 5, 7, 9, and 11 of the '064 patent.  As explained below, I disagree with Dr. McConville's opinion that a person of ordinary skill in the art would understand this claim term to mean "a matrix containing a dispersion of lipophilic granules containing active ingredient, in a hydrophilic matrix."  *See* McConville Decl. ¶ 81.

56.     I note first that the words making up the phrase "macroscopically homogeneous composition" are not particularly technical or confusing terms to a person of ordinary skill in the art.  Rather, they are common terms with accepted meaning.  For example, I am aware that "homogeneous" may be defined as *of a uniform structure or composition*.  *See, e.g.*, Ex. 14, *Merriam-Webster's Collegiate Dictionary*, at 555 (10th ed. 1993) (defining "homogeneous" as "of the same or a similar kind or nature" and "of uniform structure or composition throughout").  Similarly, I am aware that "macroscopic" generally refers to considering something in larger units (or being observable by the unaided eye).  *See, e.g.*, Ex. 14, *Merriam-Webster's Collegiate Dictionary*, at 698 (defining "macroscopic" as "large enough to be observed by the naked eye" or "considered in terms of large units or elements").  "Composition" is a well-known term that would not need further definition.  Accordingly, a person of ordinary skill in the art would understand the plain and ordinary meaning of "macroscopically homogeneous composition" to mean *a composition of uniform structure throughout, when considered as a whole or as observed by the naked eye*.  I therefore disagree with Dr. McConville's opinion that this phrase "does not have a standard plain and ordinary meaning to a person of skill in the art."  *See* McConville Decl. ¶ 82.

57.     I note further that the specifications are consistent with the plain and ordinary meaning of "macroscopically homogeneous composition" as *a composition of uniform*

*structure throughout*. For example, Examples 1, 3, and 4 of the '064 patent would all be understood to describe creating embodiments of the invention by mixing and dispersing the different components, whether excipients or granules, until a homogeneous blend is obtained, *i.e.*, a uniform composition.

58. I disagree with Dr. McConville's assertion that "[t]he '888 and '064 patents indicate that the patentees ascribed a particular meaning to the term 'macroscopically homogeneous composition.'" McConville Decl. ¶ 83. The part of the specifications that Dr. McConville cites reads: "The compression of the mixture of lipophilic and/or amphiphilic matrix, hydrogel-forming compound and, optionally, active ingredient not inglobated in the lipophilic matrix, yields a macroscopically homogeneous structure in all its volume, namely a matrix containing a dispersion of the lipophilic granules in a hydrophilic matrix." Ex. 4, '888 patent, 5:5-10; Ex. 7, '064 patent, 4:60-67. A person of ordinary skill in the art would not understand that sentence to provide a special definition of the term "macroscopically homogeneous composition" for a number of reasons. For example, that sentence does not use the phrase "macroscopically homogeneous composition." Additionally, the '888 and '064 patents' other use of the term "macroscopically homogeneous" does not suggest that it requires "a dispersion of lipophilic granules containing active ingredient, in a hydrophilic matrix." Ex. 4, '888 patent, 2:29-31 ("The resulting structure is a 'reservoir,' i.e. is not macroscopically homogeneous along all the symmetry axis of the final form."); Ex. 7, '064 patent, 2:7-9 (same). Further, the sentence cited by Dr. McConville is not a definition, but rather a description of the result of compressing certain excipients and an active ingredient in accordance with one

embodiment of the invention.  To the extent there is a definitional statement, it is for "matrix" as meaning "a macroscopically homogeneous structure in all its volume."[4]

59.     I also disagree with Dr. McConville's assertion that Example 2 of the '888 patent and Examples 1-4 of the '064 patent support interpreting "macroscopically homogeneous composition" to mean "a matrix containing a dispersion of lipophilic granules containing active ingredient, in a hydrophilic matrix."  With respect to Example 2 of the '888 patent and Example 4 of the '064 patent, which contain the same tablet core formulation, I note that neither example refers to "lipophilic granules."  Moreover, the granules that are formed contain both amphiphilic substances (diethylene glycol monoethyl ether) and lipophilic substances (*e.g.*, carnauba wax and stearic acid).  Ex. 4, '888 patent, Example 2; Ex. 7, '064 patent, Example 4.  Accordingly, a person of ordinary skill in the art would not understand these granules to be lipophilic granules.  Similarly, Examples 1-3 of the '064 patent do not mention lipophilic granules, and Examples 2 and 3 do not mention granules at all.  The granules in Example 1 would include an amphiphilic substance (lecithin), a lipophilic substance (stearic acid), and a hydrophilic substance (hydroxypropyl cellulose).  Ex. 7, '064 patent, 13:13-28.  A person of ordinary skill in the art would not understand the resulting granulate to be lipophilic.  Accordingly, a person of ordinary skill in the art would recognize that the patents' examples contradict the defendants' proposed construction.

---

[4] I note that the construction proposed by the defendants and Dr. McConville—"a matrix containing a dispersion of lipophilic granules containing active ingredient, in a hydrophilic matrix"—does not track the definition they purport to find in this portion of the specifications.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 25, 2016.

_____

Stanley S. Davis

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 25, 2016, upon the following in the manner indicated:

Karen L. Pascale, Esquire                            *VIA ELECTRONIC MAIL*
James L. Higgins, Esquire
YOUNG CONAWAY STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Par Pharmaceutical, Inc.*

Richard J. Berman, Esquire                           *VIA ELECTRONIC MAIL*
Janine A. Carlan, Esquire
Taniel E. Anderson, Esquire
Ahmed Abdel-Rahman, Esquire
ARENT FOX LLP
1717 K Street, NW
Washington, DC  20036-5342
*Attorneys for Par Pharmaceutical, Inc.*

John C. Phillips, Jr., Esquire                       *VIA ELECTRONIC MAIL*
David A. Bilson, Esquire
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE  19806
*Attorneys for Actavis Laboratories FL, Inc.*

Elizabeth J. Holland, Esquire                        *VIA ELECTRONIC MAIL*
Natasha E. Daughtrey, Esquire
Naomi L. Birbach, Esquire
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
*Attorneys for Actavis Laboratories FL, Inc.*

John T. Bennett, Esquire                                  *VIA ELECTRONIC MAIL*
GOODWIN PROCTER LLP
Exchange Place
55 State Street
Boston, MA  02109
*Attorneys for Actavis Laboratories FL, Inc.*

Karen E. Keller, Esquire                                  *VIA ELECTRONIC MAIL*
Jeffrey T. Castellano, Esquire
David M. Fry, Esquire
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE  19801
*Attorneys for Alvogen Pinebrook, LLC*

Matthew J. Becker, Esquire                               *VIA ELECTRONIC MAIL*
Jason T. Murata, Esquire
Stacie L. Ropka, Esquire
AXINN, VELTROP & HARKRIDER LLP
9 State House Square
Hartford, CT  06103
*Attorneys for Alvogen Pinebrook, LLC*

Delphine W. Knight Brown, Esquire                     *VIA ELECTRONIC MAIL*
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY  10036
*Attorneys for Alvogen Pinebrook, LLC*

Brett Garrision, Esquire                                     *VIA ELECTRONIC MAIL*
AXINN, VELTROP & HARKRIDER LLP
950 F Street NW
Washington, DC  20004
*Attorneys for Alvogen Pinebrook, LLC*

*/s/ Maryellen Noreika*
_____
Maryellen Noreika (#3208)