# EXHIBIT 1

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 2

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 3

# REDACTED IN ITS ENTIRETY

# EXHIBIT 4

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 5

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 6

**U.S. Food and Drug Administration**
Protecting and Promoting *Your* Health

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

f SHARE (HTTPS://WWW.FACEBOOK.COM/SHARER/SHARER.PHP?
U=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=N&APPL_NO=203634)

TWEET (HTTPS://TWITTER.COM/INTENT/TWEET/?TEXT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&URL=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=N&APPL_NO=203634)

+

EMAIL (MAILTO:?SUBJECT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&BODY=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=N&APPL_NO=203634)

Home (default.cfm?resetfields=1) | Back to Search Results

## Product Details for NDA 203634

UCERIS (BUDESONIDE)
9MG
                                                      Marketing Status: Prescription

**Active Ingredient:** BUDESONIDE
**Proprietary Name:** UCERIS
**Dosage Form; Route of Administration:** TABLET, EXTENDED RELEASE; ORAL
**Strength:** 9MG
**Reference Listed Drug:** Yes
**TE Code:** N/A
**Application Number:** N203634
**Product Number:** 001
**Approval Date:** Jan 14, 2013
**Applicant Holder Full Name:** VALEANT PHARMACEUTICALS INTERNATIONAL
**Marketing Status:** Prescription
**Patent and Exclusivity Information (patent_info.cfm?
Appl_type=N&Appl_No=203634&Product_No=001)**

PLAINTIFFS'
EXHIBIT
**PTX-0250**

**U.S. Food and Drug Administration**
Protecting and Promoting *Your* Health

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

f SHARE (HTTPS://WWW.FACEBOOK.COM/SHARER/SHARER.PHP?
U=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?APPL_TYPE=N&APPL_NO=203634&PRODUCT_NO=001)

🐦 TWEET (HTTPS://TWITTER.COM/INTENT/TWEET/?TEXT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&URL=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?
APPL_TYPE=N&APPL_NO=203634&PRODUCT_NO=001)

+

✉ EMAIL (MAILTO:?SUBJECT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&BODY=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?
APPL_TYPE=N&APPL_NO=203634&PRODUCT_NO=001)

Home (default.cfm?resetfields=1) | Back to Product Details

Additional Information about Patents

- Patents are published upon receipt by the Orange Book Staff and may not reflect the official receipt date as described in 21 CFR 314.53(d)(5).
- Patents listed prior to August 18, 2003 are flagged with method of use claims only as applicable and submitted by the sponsor. These patents may not be flagged with respect to other claims which may apply.

## Patent and Exclusivity for: N203634

Product 001
BUDESONIDE (UCERIS) TABLET, EXTENDED RELEASE 9MG

### Patent Data

| Product No | Patent No | Patent Expiration | Drug Substance Claim | Drug Product Claim | Patent Use Code | Delist Requested |
|---|---|---|---|---|---|---|
| 001 | 7410651 | Jun 9, 2020 | | DP | U-1325 (show_code.cfm?id=1325&type=0) | |
| 001 | 7431943 | Jun 9, | | DP | (show_code.cfm? | |

PTX-0250.0002

| | | | | |
|---|---|---|---|---|
| | | 2020 | | (show_code.cfm?id=&type=0) |
| 001 | 8293273 | Jun 9, 2020 | DP | (show_code.cfm?id=&type=0) |
| 001 | 8784888 | Jun 9, 2020 | DP | (show_code.cfm?id=&type=0) |
| 001 | 8895064 | Sep 7, 2031 | DP | (show_code.cfm?id=&type=0) |
| 001 | 9132093 | Sep 7, 2031 | DP | (show_code.cfm?id=&type=0) |
| 001 | 9192581 | Sep 7, 2031 | DP | U-1325 (show_code.cfm?id=1325&type=0) |
| 001 | 9320716 | Jun 9, 2020 | DP | U-1325 (show_code.cfm?id=1325&type=0) |
| 001 | RE43799 | Jun 9, 2020 | DP | U-1325 (show_code.cfm?id=1325&type=0) |

## Exclusivity Data

| Product No | Exclusivity Code | Exclusivity Expiration |
|---|---|---|
| 001 | NDF (show_code.cfm?id=1092&type=1) | Jan 14, 2016 |

View a list of all patent use codes (results_patent.cfm)
View a list of all exclusivity codes (results_exclusivity.cfm)

PTX-0250.0003

# EXHIBIT 7

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 8

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 9

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 10

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 11

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 12

**From:** Rupert, Melanie R.
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Becker, Matthew J. (mbecker@axinn.com)
**Cc:** Knight Brown, Delphine W. (dknightbrown@axinn.com); Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear Matt,

We write with a proposal for Alvogen's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 22 of the '716 patent against Alvogen;

- In exchange, Alvogen will drop its entire invalidity case against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Alvogen but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

    o If Alvogen is found not to infringe claim 5 of the '888 patent and claim 22 of the '716 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

    o If Alvogen is found to infringe claim 5 of the '888 patent and/or claim 22 of the '716 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Alvogen will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review.  We are available to discuss any questions that you may have.

Best regards,
Melanie



**Melanie R. Rupert | Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

# EXHIBIT 13

**From:** Rupert, Melanie R.
**Sent:** Monday, April 24, 2017 12:09 PM
**To:** Becker, Matthew J.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Matt,

Thanks for your response.  Please provide plaintiffs with Alvogen's specific counterproposal for our consideration.  In asking for Alvogen's specific counterproposal, we are not somehow agreeing that plaintiffs' original proposal is off the table.  Instead, plaintiffs would like to the benefit of considering Alvogen's counterproposal in an effort to work with Alvogen to find some common ground for streamlining the case.

We look forward to your response.

Best regards,
Melanie

---

**From:** Becker, Matthew J. [mailto:mbecker@axinn.com]
**Sent:** Wednesday, April 19, 2017 5:49 PM
**To:** Rupert, Melanie R.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Melanie,

Thank you for your proposal.  We agree that given the large number of claims asserted against Alvogen (and similarly against Actavis), and the overlap of many of the asserted claims, plaintiffs should markedly reduce the number of asserted claims they will pursue at trial.

Alvogen does not agree to forego entirely its invalidity defenses on the two proposed claims in exchange for a simple claim reduction.  We also do not agree that judgment on the '799 and '651 patents should be tied to the outcome of the two proposed claims because, among other things, the substantive issues on '799 and '651 patents are very different.  Alvogen would, however, consider limiting its invalidity defenses as to the two proposed claims.   If this approach is generally acceptable, we can prepare a specific proposal.  Please let us know if you would like to discuss this.

Regards,

Matt

**Matthew J. Becker**



Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103

Office 860.275.8177
Mobile 860.882.9551
mbecker@axinn.com
**Axinn.com**

***Click here*** to send a secure file via ShareFile

---

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Becker, Matthew J.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear Matt,

We write with a proposal for Alvogen's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 22 of the '716 patent against Alvogen;

- In exchange, Alvogen will drop its entire invalidity case against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Alvogen but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

  o If Alvogen is found not to infringe claim 5 of the '888 patent and claim 22 of the '716 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

  o If Alvogen is found to infringe claim 5 of the '888 patent and/or claim 22 of the '716 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Alvogen will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review.  We are available to discuss any questions that you may have.

Best regards,
Melanie

---



**Melanie R. Rupert | Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

*****************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

For additional information, please visit our website at

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Notice: The information contained in this electronic mail and any attached documents from Axinn, Veltrop & Harkrider LLP is confidential. This email may be an attorney-client communication, and as such is privileged and confidential. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this electronic mail in error, please notify us immediately by telephone (212) 728-2200/(860) 275-8100 or by reply electronic mail to the sender.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT 14

**From:** Rupert, Melanie R.
**Sent:** Thursday, April 27, 2017 4:22 PM
**To:** Bennett, John T (JBennett@goodwinlaw.com); Becker, Matthew J. (mbecker@axinn.com)
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Counsel,

In an effort to streamline these cases for trial, we first contacted defendants about narrowing the asserted claims and the issues to be litigated in these cases two weeks ago, on Wednesday, April 12, before defendants even raised the issue. To date, defendants have not provided specific counterproposals to plaintiffs' initial proposal to streamline the case, despite our follow-up requests on Monday, April 24. Plaintiffs remain committed to streamlining the case, and we have cut and pasted our prior correspondence on this issue in the email chain below (in chronological order) for ease of reference for all parties.

As made clear in the correspondence below, plaintiffs have made proposals aimed at reducing the number of claims to be asserted, including through the use of exemplary claims. Defendants, however, have not made any meaningful proposals and instead simply repeat their blanket demand that plaintiffs unilaterally reduce the number of claims to be asserted, without any commitment by defendants to streamline their part of the case.

We again ask for you to send the substantive counterproposal(s) to streamline the case that you have referenced in your prior emails. We look forward to your response.

Regards,
Melanie

**From:** Bennett, John T [mailto:JBennett@goodwinlaw.com]
**Sent:** Tuesday, April 25, 2017 2:53 PM
**To:** Rupert, Melanie R.; Conca, David M.; Tymoczko, Nicholas
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Becker, Matthew J. (mbecker@axinn.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)


Counsel:

As set forth below, Plaintiffs are currently asserting over 50 patent claims against Actavis and over 35 claims against Alvogen. Many of these claims cover similar subject matter. Notwithstanding the parties' ongoing discussions to narrow the issues for trial, Defendants reiterate their request that Plaintiffs meaningfully reduce the number of asserted claims on which they will proceed to trial now. Plaintiffs' failure to cooperate with this request to date is imposing unnecessary trial preparation costs and unfairly prejudices Defendants, who remain in the dark about the true scope of the trial set to begin in several weeks. This prejudice will be exacerbated if Plaintiffs attempt a last minute reduction of claims on the eve of trial. Unless Plaintiffs meaningfully reduce the number of asserted claims by May 3, 2017,

Defendants intend to raise this issue with the Court at the pretrial conference.  Defendants reserve their right to seek all available relief with respect to this issue.

Regards,

**John T. Bennett**

 **GOODWIN**

Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f  (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

**From:** Rupert, Melanie R.
**Sent:** Monday, April 24, 2017 12:09 PM
**To:** 'Bennett, John T'
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial

John,

Thanks for your response.  Please provide plaintiffs with Actavis's specific counterproposal for our consideration.  In asking for Actavis's specific counterproposal, we are not somehow agreeing that plaintiffs' original proposal is off the table.  Instead, plaintiffs would like to the benefit of considering Actavis's counterproposal in an effort to work with Actavis to find some common ground for streamlining the case.

We look forward to your response.

Best regards,
Melanie

**From:** Rupert, Melanie R.
**Sent:** Monday, April 24, 2017 12:09 PM
**To:** 'Becker, Matthew J.'
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Matt,

Thanks for your response.  Please provide plaintiffs with Alvogen's specific counterproposal for our consideration.  In asking for Alvogen's specific counterproposal, we are not somehow agreeing that plaintiffs' original proposal is off the table.  Instead, plaintiffs would like to the benefit of considering Alvogen's counterproposal in an effort to work with Alvogen to find some common ground for streamlining the case.

We look forward to your response.

Best regards,
Melanie

**From:** Becker, Matthew J. [mailto:mbecker@axinn.com]
**Sent:** Wednesday, April 19, 2017 5:49 PM
**To:** Rupert, Melanie R.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Melanie,

Thank you for your proposal.  We agree that given the large number of claims asserted against Alvogen (and similarly against Actavis), and the overlap of many of the asserted claims, plaintiffs should markedly reduce the number of asserted claims they will pursue at trial.

Alvogen does not agree to forego entirely its invalidity defenses on the two proposed claims in exchange for a simple claim reduction.  We also do not agree that judgment on the '799 and '651 patents should be tied to the outcome of the two proposed claims because, among other things, the substantive issues on '799 and '651 patents are very different.  Alvogen would, however, consider limiting its invalidity defenses as to the two proposed claims.   If this approach is generally acceptable, we can prepare a specific proposal.  Please let us know if you would like to discuss this.

Regards,

Matt


**Matthew J. Becker**



Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103
Office 860.275.8177
Mobile 860.882.9551
mbecker@axinn.com
**Axinn.com**


**Sent:** Wednesday, April 19, 2017 1:22 PM
**To:** Rupert, Melanie R.
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial



Melanie:

We have now discussed your proposal with our client.  Actavis cannot agree to completely relinquish its invalidity defenses and/or agree to an conditional infringement judgment on patents that would not be asserted at trial in exchange for Plaintiffs' proposed narrowing of claims.  That being said, we are open to developing a counterproposal that will narrow our invalidity case in exchange for Plaintiffs' proposed narrowing.  Please let us know if this is a conceptual framework that Plaintiffs are willing to work with.  If so, Actavis will put together a more detailed counterproposal for Plaintiffs' review.  As mentioned in my email from last week, we expect Plaintiffs will reduce the

number of claims currently being asserted regardless of whether the parties are able to work out an agreement under this framework.

Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o   (617) 570-8712
f   (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

**From:** Bennett, John T
**Sent:** Thursday, April 13, 2017 11:21 AM
**To:** 'Rupert, Melanie R.'
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial

Melanie:

Thanks for your proposal.  We will consider it and revert once we've had an opportunity to discuss with our client.  As set forth in the separate email I've sent on behalf of both defendants, regardless of the fate of this particular proposal, we expect Plaintiffs to make a good faith effort to reduce the number of claims they are currently asserting in the case prior to the pretrial conference.  We look forward to discussing these issues further in the coming days.

Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o   (617) 570-8712
f   (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

**From:** Bennett, John T
**Sent:** Thursday, April 13, 2017 11:20 AM
**To:** Rupert, Melanie R. (melanierupert@paulhastings.com); Conca, David M. (davidconca@paulhastings.com); 'Tymoczko, Nicholas'
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Becker, Matthew J. (mbecker@axinn.com); Cosmo-Uceris-PH (Cosmo-Uceris-PH@paulhastings.com); Noreika, Maryellen; 'gfrischling@irell.com'; 'yjlu@irell.com'; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com
**Subject:** Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Counsel:

I write regarding several issues concerning the upcoming trial in the Uceris case in the hopes that we can resolve or narrow potential disputes before the filing of the pretrial order.

First, Plaintiffs are currently asserting over 50 patent claims against Actavis and over 35 claims again Alvogen, many of which cover very similar subject matter.  Defendants request that Plaintiffs meaningfully reduce the number of asserted claims for trial in advance of the pretrial conference.  The parties should have clarity on the scope of the case that will actually be tried soon.  We look forward to discussing this issue with you during next week's meet and confer.  If we are unable to arrive at a means to narrow the scope of the claims asserted, we intend to raise this with the Court at the pretrial conference.

Second, Plaintiffs have included Dr. Lofberg's expert report on their exhibit list.  Please confirm by the end of Friday, April 14, 2017 whether Plaintiffs are seeking to admit into evidence or otherwise rely on paragraphs 18, 19, and 25-27 (and only those paragraphs) of Dr. Lofberg's report over Defendants' objections under the residual exception to hearsay FRE 807(a), per Andy Cochran's March 6, 2017 email.  If Plaintiffs do not intend to seek admission or otherwise rely on Dr. Lofberg's expert report at trial, or if Plaintiffs intentions with the report are not limited as described in the March 6, 2017 email, please let us know by Friday.

Third, in Plaintiffs' contentions, expert reports and statement of contested fact, Plaintiffs only have raised the doctrine of equivalents with respect to the "a lipophilic matrix consisting of lipophilic compounds with a melting point between 40° C. and 90° C. in which the active ingredient is at least partially inglobated" limitation of claims 1 and 4 of the '651 patent and claims 1 and 4 of the '799 patent.  Nevertheless, Plaintiffs have identified infringement, either literal or through the doctrine of equivalents, as an issue of law to be litigated for each patent in suit.  Please confirm by Friday that Plaintiffs do not intend to offer evidence or argument at trial or in their post-trial briefs about the doctrine of equivalents with respect to any other limitation than the one identified above.

Finally, based on Plaintiffs' decision not to list any live fact witnesses on their witness list, we understand that Plaintiffs will not be calling the inventors of the patents-in-suit to testify or otherwise relying on their testimony.  If this understanding is incorrect, please let us know immediately.

Regards,

John T. Bennett

 **GOODWIN**

Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f  (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Bennett, John T
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear John,

We write with a proposal for Actavis's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 4 of the '273 patent against Actavis;

- In exchange, Actavis will drop its entire invalidity cases against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Actavis but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

  o If Actavis is found not to infringe claim 5 of the '888 patent and claim 4 of the '273 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

  o If Actavis is found to infringe claim 5 of the '888 patent and/or claim 4 of the '273 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Actavis will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review.  We are available to discuss any questions that you may have.

Best regards,
Melanie

---



**Melanie R. Rupert | Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Becker, Matthew J.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear Matt,

We write with a proposal for Alvogen's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 22 of the '716 patent against Alvogen;

- In exchange, Alvogen will drop its entire invalidity case against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Alvogen but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

  o If Alvogen is found not to infringe claim 5 of the '888 patent and claim 22 of the '716 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

  o If Alvogen is found to infringe claim 5 of the '888 patent and/or claim 22 of the '716 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Alvogen will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review.  We are available to discuss any questions that you may have.

Best regards,
Melanie

---



**Melanie R. Rupert** | **Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

# EXHIBIT 15

**From:** Rupert, Melanie R.
**Sent:** Tuesday, May 02, 2017 3:59 PM
**To:** Bennett, John T; Becker, Matthew J. (mbecker@axinn.com)
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

John,

Unfortunately, defendants' proposal does not serve to streamline the issues for trial in a way that is material. For example, there would be no change in the number of legal issues to be decided, the number of trial witnesses required, or the general scope of the witnesses' respective testimony. Moreover, defendants' proposal to reduce the number prior art references for either anticipation or obviousness to a total of five is not meaningful because the time that is presently allocated for defendants' trial presentation already serves to limit reliance by defendants on a larger number of prior art references. We further note that defendants' proposal would not foreclose sweeping in the hundreds of prior art references contained in defendants' Section 282 notice under the guise of establishing background principles, the state of the art as of the priority date, and rebutting plaintiffs' validity evidence.

As you know, plaintiffs' original proposal to streamline the case was predicated on defendants' dropping their invalidity case in its entirety. This would have limited the number of legal issues to one (infringement), reduced the number of expert witnesses at trial from fourteen to four or five, and significantly reduced the scope of testimony of most remaining witnesses.

In the interest of moving forward, however, plaintiffs would be amenable to an agreement that would allow defendants to proceed on the claims that plaintiffs previously identified as part of their proposal, if in exchange defendants agreed not to raise obviousness defenses against those claims. This proposal would significantly and materially streamline the trial, including the number of witnesses and issues, while still allowing the defendants to challenge the validity of the patents on specific grounds.

If defendants are amenable to such an arrangement, please let us know so that we can try to work out the details of such a proposal. Plaintiffs' willingness to narrow the case in the aggressive manner that we are proposing assumes that defendants will be willing to narrow their case in the same aggressive manner. If defendants are not willing to do so, plaintiffs intend to try this case in accordance with the existing pretrial order, including the time allocated by the Court.

Best regards,
Melanie

---

**From:** Bennett, John T [mailto:JBennett@goodwinlaw.com]
**Sent:** Friday, April 28, 2017 5:15 PM
**To:** Rupert, Melanie R.; Becker, Matthew J. (mbecker@axinn.com)
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Melanie:

Thanks for your message.  As Defendants have noted in several communications, including my April 25, 2017 email to you, we expect Plaintiffs to reduce the large number of claims being asserted in this case by May 3, 2017 regardless of the outcome of our negotiation over this particular case narrowing proposal.  We trust Plaintiffs are working to narrow their infringement proofs to a reasonable scope.  Defendants also have been actively cooperating to advance discussion of your April 12, 2017 proposal as reflected in the correspondence below.

With reference to Plaintiffs' case narrowing proposal, Actavis is willing to limit the number of prior art references used as prima facie combination references for either anticipation or obviousness to a total of 5 in exchange for Plaintiffs limiting their infringement proofs as you have proposed.  This limit would not apply to any prior art references used to establish background principles, the state of the art as of the priority date or in rebuttal to Plaintiffs' evidence regarding invalidity.  Actavis would be willing to identify the 5 prima facie references when and if the parties consummate an agreement via stipulation.  We have conferred with Alvogen and understand they are willing to abide by such a limitation for both defendants and that they will raise some additional terms separately.

If Plaintiffs are amenable to this arrangement, please send us a proposed stipulation for review.

Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f  (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

---

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Thursday, April 27, 2017 4:22 PM
**To:** Bennett, John T; Becker, Matthew J. (mbecker@axinn.com)
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Counsel,

In an effort to streamline these cases for trial, we first contacted defendants about narrowing the asserted claims and the issues to be litigated in these cases two weeks ago, on Wednesday, April 12, before defendants even raised the issue.  To date, defendants have not provided specific counterproposals to plaintiffs' initial proposal to streamline the case, despite our follow-up requests on Monday, April 24.  Plaintiffs remain committed to streamlining the case, and we have cut and pasted our prior correspondence on this issue in the email chain below (in chronological order) for ease of reference for all parties.

As made clear in the correspondence below, plaintiffs have made proposals aimed at reducing the number of claims to be asserted, including through the use of exemplary claims.  Defendants, however, have not made any meaningful proposals and instead simply repeat their blanket demand that plaintiffs unilaterally reduce the number of claims to be asserted, without any commitment by defendants to streamline their part of the case.

We again ask for you to send the substantive counterproposal(s) to streamline the case that you have referenced in your prior emails.  We look forward to your response.

Regards,
Melanie

**From:** Bennett, John T [mailto:JBennett@goodwinlaw.com]
**Sent:** Tuesday, April 25, 2017 2:53 PM
**To:** Rupert, Melanie R.; Conca, David M.; Tymoczko, Nicholas
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Becker, Matthew J. (mbecker@axinn.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)


Counsel:

As set forth below, Plaintiffs are currently asserting over 50 patent claims against Actavis and over 35 claims against Alvogen.  Many of these claims cover similar subject matter.  Notwithstanding the parties' ongoing discussions to narrow the issues for trial, Defendants reiterate their request that Plaintiffs meaningfully reduce the number of asserted claims on which they will proceed to trial now.  Plaintiffs' failure to cooperate with this request to date is imposing unnecessary trial preparation costs and unfairly prejudices Defendants, who remain in the dark about the true scope of the trial set to begin in several weeks.  This prejudice will be exacerbated if Plaintiffs attempt a last minute reduction of claims on the eve of trial.  Unless Plaintiffs meaningfully reduce the number of asserted claims by May 3, 2017, Defendants intend to raise this issue with the Court at the pretrial conference.  Defendants reserve their right to seek all available relief with respect to this issue.

Regards,

**John T. Bennett**

 GOODWIN

Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f   (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com


**From:** Rupert, Melanie R.
**Sent:** Monday, April 24, 2017 12:09 PM
**To:** 'Bennett, John T'
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial

John,

Thanks for your response.  Please provide plaintiffs with Actavis's specific counterproposal for our consideration.  In asking for Actavis's specific counterproposal, we are not somehow agreeing that plaintiffs' original proposal is off the

table.  Instead, plaintiffs would like to the benefit of considering Actavis's counterproposal in an effort to work with Actavis to find some common ground for streamlining the case.

We look forward to your response.

Best regards,
Melanie


**From:** Rupert, Melanie R.
**Sent:** Monday, April 24, 2017 12:09 PM
**To:** 'Becker, Matthew J.'
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Matt,

Thanks for your response.  Please provide plaintiffs with Alvogen's specific counterproposal for our consideration.  In asking for Alvogen's specific counterproposal, we are not somehow agreeing that plaintiffs' original proposal is off the table.  Instead, plaintiffs would like to the benefit of considering Alvogen's counterproposal in an effort to work with Alvogen to find some common ground for streamlining the case.

We look forward to your response.

Best regards,
Melanie


**From:** Becker, Matthew J. [mailto:mbecker@axinn.com]
**Sent:** Wednesday, April 19, 2017 5:49 PM
**To:** Rupert, Melanie R.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Melanie,

Thank you for your proposal.  We agree that given the large number of claims asserted against Alvogen (and similarly against Actavis), and the overlap of many of the asserted claims, plaintiffs should markedly reduce the number of asserted claims they will pursue at trial.

Alvogen does not agree to forego entirely its invalidity defenses on the two proposed claims in exchange for a simple claim reduction.  We also do not agree that judgment on the '799 and '651 patents should be tied to the outcome of the two proposed claims because, among other things, the substantive issues on '799 and '651 patents are very different.  Alvogen would, however, consider limiting its invalidity defenses as to the two proposed claims.   If this approach is generally acceptable, we can prepare a specific proposal.  Please let us know if you would like to discuss this.

Regards,

Matt


**Matthew J. Becker**



Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103
Office 860.275.8177
Mobile 860.882.9551
mbecker@axinn.com
**Axinn.com**

**Sent:** Wednesday, April 19, 2017 1:22 PM
**To:** Rupert, Melanie R.
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial


Melanie:

We have now discussed your proposal with our client.  Actavis cannot agree to completely relinquish its invalidity defenses and/or agree to an conditional infringement judgment on patents that would not be asserted at trial in exchange for Plaintiffs' proposed narrowing of claims.  That being said, we are open to developing a counterproposal that will narrow our invalidity case in exchange for Plaintiffs' proposed narrowing.  Please let us know if this is a conceptual framework that Plaintiffs are willing to work with.  If so, Actavis will put together a more detailed counterproposal for Plaintiffs' review.  As mentioned in my email from last week, we expect Plaintiffs will reduce the number of claims currently being asserted regardless of whether the parties are able to work out an agreement under this framework.

Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f  (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com



**From:** Bennett, John T
**Sent:** Thursday, April 13, 2017 11:21 AM
**To:** 'Rupert, Melanie R.'
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial


Melanie:

Thanks for your proposal.  We will consider it and revert once we've had an opportunity to discuss with our client.  As set forth in the separate email I've sent on behalf of both defendants, regardless of the fate of this particular proposal, we expect Plaintiffs to make a good faith effort to reduce the number of claims they are currently asserting in the case prior to the pretrial conference.  We look forward to discussing these issues further in the coming days.


Regards,

John T. Bennett

 GOODWIN

Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f   (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com




**From:** Bennett, John T
**Sent:** Thursday, April 13, 2017 11:20 AM
**To:** Rupert, Melanie R. (melanierupert@paulhastings.com); Conca, David M. (davidconca@paulhastings.com); 'Tymoczko, Nicholas'
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Becker, Matthew J. (mbecker@axinn.com); Cosmo-Uceris-PH (Cosmo-Uceris-PH@paulhastings.com); Noreika, Maryellen; 'gfrischling@irell.com'; 'yjlu@irell.com'; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com
**Subject:** Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Counsel:

I write regarding several issues concerning the upcoming trial in the Uceris case in the hopes that we can resolve or narrow potential disputes before the filing of the pretrial order.

First, Plaintiffs are currently asserting over 50 patent claims against Actavis and over 35 claims again Alvogen, many of which cover very similar subject matter.  Defendants request that Plaintiffs meaningfully reduce the number of asserted claims for trial in advance of the pretrial conference.  The parties should have clarity on the scope of the case that will actually be tried soon.  We look forward to discussing this issue with you during next week's meet and confer.  If we are unable to arrive at a means to narrow the scope of the claims asserted, we intend to raise this with the Court at the pretrial conference.

Second, Plaintiffs have included Dr. Lofberg's expert report on their exhibit list.  Please confirm by the end of Friday, April 14, 2017 whether Plaintiffs are seeking to admit into evidence or otherwise rely on paragraphs 18, 19, and 25-27 (and only those paragraphs) of Dr. Lofberg's report over Defendants' objections under the residual exception to hearsay FRE 807(a), per Andy Cochran's March 6, 2017 email.  If Plaintiffs do not intend to seek admission or otherwise rely on Dr. Lofberg's expert report at trial, or if Plaintiffs intentions with the report are not limited as described in the March 6, 2017 email, please let us know by Friday.

Third, in Plaintiffs' contentions, expert reports and statement of contested fact, Plaintiffs only have raised the doctrine of equivalents with respect to the "a lipophilic matrix consisting of lipophilic compounds with a melting point between 40° C. and 90° C. in which the active ingredient is at least partially inglobated" limitation of claims 1 and 4 of the '651 patent and claims 1 and 4 of the '799 patent.  Nevertheless, Plaintiffs have identified infringement, either literal or through the doctrine of equivalents, as an issue of law to be litigated for each patent in suit.  Please confirm by Friday

that Plaintiffs do not intend to offer evidence or argument at trial or in their post-trial briefs about the doctrine of equivalents with respect to any other limitation than the one identified above.

Finally, based on Plaintiffs' decision not to list any live fact witnesses on their witness list, we understand that Plaintiffs will not be calling the inventors of the patents-in-suit to testify or otherwise relying on their testimony.  If this understanding is incorrect, please let us know immediately.

Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f   (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

*******************************************************************
This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*******************************************************************

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Bennett, John T
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear John,

We write with a proposal for Actavis's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 4 of the '273 patent against Actavis;

- In exchange, Actavis will drop its entire invalidity cases against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Actavis but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

  o If Actavis is found not to infringe claim 5 of the '888 patent and claim 4 of the '273 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

  o If Actavis is found to infringe claim 5 of the '888 patent and/or claim 4 of the '273 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Actavis will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review. We are available to discuss any questions that you may have.

Best regards,
Melanie



**Melanie R. Rupert** | **Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Becker, Matthew J.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear Matt,

We write with a proposal for Alvogen's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 22 of the '716 patent against Alvogen;

- In exchange, Alvogen will drop its entire invalidity case against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Alvogen but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

  o If Alvogen is found not to infringe claim 5 of the '888 patent and claim 22 of the '716 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

  o If Alvogen is found to infringe claim 5 of the '888 patent and/or claim 22 of the '716 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Alvogen will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review. We are available to discuss any questions that you may have.

Best regards,
Melanie



**Melanie R. Rupert** | **Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

*************************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

For additional information, please visit our website at

# EXHIBIT 16

| | |
|---|---|
| **From:** | Rupert, Melanie R. |
| **Sent:** | Thursday, May 4, 2017 5:50 PM |
| **To:** | Bennett, John T; Becker, Matthew J. (mbecker@axinn.com) |
| **Cc:** | DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas |
| **Subject:** | RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193) |

Dear John and Matt,

Based on the parties' discussions during the meet and confer call yesterday and the prior negotiations among the parties to streamline the case, it appears that the parties could come to an agreement with the following terms:

Plaintiffs would be willing to limit our asserted claims to a maximum of one claim from each patent against each of Alvogen and Actavis, for a maximum total of nine asserted claims, provided that defendants agree to limit their *prima facie* case of obviousness to five total alleged prior art references (as proposed by defendants on Friday, April 28, 2017), to limit their use of additional references for purposes of (1) background, (2) state of the art as of the priority date, and (3) rebuttal to plaintiffs' validity case to no more than ten collective references (a concept suggested by defendants on yesterday's call), and to drop their anticipation defense (as proposed by defendants on yesterday's call).

Upon defendants' agreement to the three terms specified above, Plaintiffs would identify the asserted claims, and defendants would identify the five alleged *prima facie* prior art references and the ten collective background/state of the art/rebuttal references no later than twenty-four hours later.

If defendants agree, please let us know so that we may identify the asserted claims.

Kind regards,
Melanie

---

**From:** Rupert, Melanie R.
**Sent:** Tuesday, May 2, 2017 3:59 PM
**To:** 'Bennett, John T'; Becker, Matthew J. (mbecker@axinn.com)
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

John,

Unfortunately, defendants' proposal does not serve to streamline the issues for trial in a way that is material.  For example, there would be no change in the number of legal issues to be decided, the number of trial witnesses required, or the general scope of the witnesses' respective testimony.  Moreover, defendants' proposal to reduce the number prior art references for either anticipation or obviousness to a total of five is not meaningful because the time that is presently allocated for defendants' trial presentation already serves to limit reliance by defendants on a larger number of prior art references.  We further note that defendants' proposal would not foreclose sweeping in the hundreds of

prior art references contained in defendants' Section 282 notice under the guise of establishing background principles, the state of the art as of the priority date, and rebutting plaintiffs' validity evidence.

As you know, plaintiffs' original proposal to streamline the case was predicated on defendants' dropping their invalidity case in its entirety.  This would have limited the number of legal issues to one (infringement), reduced the number of expert witnesses at trial from fourteen to four or five, and significantly reduced the scope of testimony of most remaining witnesses.

In the interest of moving forward, however, plaintiffs would be amenable to an agreement that would allow defendants to proceed on the claims that plaintiffs previously identified as part of their proposal, if in exchange defendants agreed not to raise obviousness defenses against those claims.  This proposal would significantly and materially streamline the trial, including the number of witnesses and issues, while still allowing the defendants to challenge the validity of the patents on specific grounds.

If defendants are amenable to such an arrangement, please let us know so that we can try to work out the details of such a proposal.   Plaintiffs' willingness to narrow the case in the aggressive manner that we are proposing assumes that defendants will be willing to narrow their case in the same aggressive manner.  If defendants are not willing to do so, plaintiffs intend to try this case in accordance with the existing pretrial order, including the time allocated by the Court.

Best regards,
Melanie

---

**From:** Bennett, John T [mailto:JBennett@goodwinlaw.com]
**Sent:** Friday, April 28, 2017 5:15 PM
**To:** Rupert, Melanie R.; Becker, Matthew J. (mbecker@axinn.com)
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Melanie:

Thanks for your message.  As Defendants have noted in several communications, including my April 25, 2017 email to you, we expect Plaintiffs to reduce the large number of claims being asserted in this case by May 3, 2017 regardless of the outcome of our negotiation over this particular case narrowing proposal.  We trust Plaintiffs are working to narrow their infringement proofs to a reasonable scope.  Defendants also have been actively cooperating to advance discussion of your April 12, 2017 proposal as reflected in the correspondence below.

With reference to Plaintiffs' case narrowing proposal, Actavis is willing to limit the number of prior art references used as prima facie combination references for either anticipation or obviousness to a total of 5 in exchange for Plaintiffs limiting their infringement proofs as you have proposed.  This limit would not apply to any prior art references used to establish background principles, the state of the art as of the priority date or in rebuttal to Plaintiffs' evidence regarding invalidity.  Actavis would be willing to identify the 5 prima facie references when and if the parties consummate an agreement via stipulation.  We have conferred with Alvogen and understand they are willing to abide by such a limitation for both defendants and that they will raise some additional terms separately.

If Plaintiffs are amenable to this arrangement, please send us a proposed stipulation for review.

Regards,

John T. Bennett

2



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f  (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

---

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Thursday, April 27, 2017 4:22 PM
**To:** Bennett, John T; Becker, Matthew J. (mbecker@axinn.com)
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com; Conca, David M.; Tymoczko, Nicholas
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Counsel,

In an effort to streamline these cases for trial, we first contacted defendants about narrowing the asserted claims and the issues to be litigated in these cases two weeks ago, on Wednesday, April 12, before defendants even raised the issue.  To date, defendants have not provided specific counterproposals to plaintiffs' initial proposal to streamline the case, despite our follow-up requests on Monday, April 24.  Plaintiffs remain committed to streamlining the case, and we have cut and pasted our prior correspondence on this issue in the email chain below (in chronological order) for ease of reference for all parties.

As made clear in the correspondence below, plaintiffs have made proposals aimed at reducing the number of claims to be asserted, including through the use of exemplary claims.  Defendants, however, have not made any meaningful proposals and instead simply repeat their blanket demand that plaintiffs unilaterally reduce the number of claims to be asserted, without any commitment by defendants to streamline their part of the case.

We again ask for you to send the substantive counterproposal(s) to streamline the case that you have referenced in your prior emails.  We look forward to your response.

Regards,
Melanie

**From:** Bennett, John T [mailto:JBennett@goodwinlaw.com]
**Sent:** Tuesday, April 25, 2017 2:53 PM
**To:** Rupert, Melanie R.; Conca, David M.; Tymoczko, Nicholas
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Becker, Matthew J. (mbecker@axinn.com); Cosmo-Uceris-PH; Noreika, Maryellen; gfrischling@irell.com; yjlu@irell.com; Knight Brown, Delphine W. (dknightbrown@axinn.com) (dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com
**Subject:** RE: Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Counsel:

As set forth below, Plaintiffs are currently asserting over 50 patent claims against Actavis and over 35 claims against Alvogen.  Many of these claims cover similar subject matter.  Notwithstanding the parties' ongoing discussions to

3

narrow the issues for trial, Defendants reiterate their request that Plaintiffs meaningfully reduce the number of asserted claims on which they will proceed to trial now.  Plaintiffs' failure to cooperate with this request to date is imposing unnecessary trial preparation costs and unfairly prejudices Defendants, who remain in the dark about the true scope of the trial set to begin in several weeks.  This prejudice will be exacerbated if Plaintiffs attempt a last minute reduction of claims on the eve of trial.  Unless Plaintiffs meaningfully reduce the number of asserted claims by May 3, 2017, Defendants intend to raise this issue with the Court at the pretrial conference.  Defendants reserve their right to seek all available relief with respect to this issue.


Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f  (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com


**From:** Rupert, Melanie R.
**Sent:** Monday, April 24, 2017 12:09 PM
**To:** 'Bennett, John T'
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial

John,

Thanks for your response.  Please provide plaintiffs with Actavis's specific counterproposal for our consideration.  In asking for Actavis's specific counterproposal, we are not somehow agreeing that plaintiffs' original proposal is off the table.  Instead, plaintiffs would like to the benefit of considering Actavis's counterproposal in an effort to work with Actavis to find some common ground for streamlining the case.

We look forward to your response.


Best regards,
Melanie


**From:** Rupert, Melanie R.
**Sent:** Monday, April 24, 2017 12:09 PM
**To:** 'Becker, Matthew J.'
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Matt,

Thanks for your response.  Please provide plaintiffs with Alvogen's specific counterproposal for our consideration.  In asking for Alvogen's specific counterproposal, we are not somehow agreeing that plaintiffs' original proposal is off the table.  Instead, plaintiffs would like to the benefit of considering Alvogen's counterproposal in an effort to work with Alvogen to find some common ground for streamlining the case.

We look forward to your response.

Best regards,
Melanie

**From:** Becker, Matthew J. [mailto:mbecker@axinn.com]
**Sent:** Wednesday, April 19, 2017 5:49 PM
**To:** Rupert, Melanie R.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** RE: Uceris - Proposal for Trial

Melanie,

Thank you for your proposal.  We agree that given the large number of claims asserted against Alvogen (and similarly against Actavis), and the overlap of many of the asserted claims, plaintiffs should markedly reduce the number of asserted claims they will pursue at trial.

Alvogen does not agree to forego entirely its invalidity defenses on the two proposed claims in exchange for a simple claim reduction.  We also do not agree that judgment on the '799 and '651 patents should be tied to the outcome of the two proposed claims because, among other things, the substantive issues on '799 and '651 patents are very different.  Alvogen would, however, consider limiting its invalidity defenses as to the two proposed claims.    If this approach is generally acceptable, we can prepare a specific proposal.  Please let us know if you would like to discuss this.

Regards,

Matt


**Matthew J. Becker**



Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103
Office 860.275.8177
Mobile 860.882.9551
mbecker@axinn.com
**Axinn.com**


**Sent:** Wednesday, April 19, 2017 1:22 PM
**To:** Rupert, Melanie R.
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial


Melanie:

We have now discussed your proposal with our client.  Actavis cannot agree to completely relinquish its invalidity defenses and/or agree to a conditional infringement judgment on patents that would not be asserted at trial in

5

exchange for Plaintiffs' proposed narrowing of claims.  That being said, we are open to developing a counterproposal that will narrow our invalidity case in exchange for Plaintiffs' proposed narrowing.  Please let us know if this is a conceptual framework that Plaintiffs are willing to work with.  If so, Actavis will put together a more detailed counterproposal for Plaintiffs' review.  As mentioned in my email from last week, we expect Plaintiffs will reduce the number of claims currently being asserted regardless of whether the parties are able to work out an agreement under this framework.

Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f   (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

**From:** Bennett, John T
**Sent:** Thursday, April 13, 2017 11:21 AM
**To:** 'Rupert, Melanie R.'
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com)
**Subject:** RE: Uceris - Proposal for Trial

Melanie:

Thanks for your proposal.  We will consider it and revert once we've had an opportunity to discuss with our client.  As set forth in the separate email I've sent on behalf of both defendants, regardless of the fate of this particular proposal, we expect Plaintiffs to make a good faith effort to reduce the number of claims they are currently asserting in the case prior to the pretrial conference.  We look forward to discussing these issues further in the coming days.

Regards,

**John T. Bennett**



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f   (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

**From:** Bennett, John T
**Sent:** Thursday, April 13, 2017 11:20 AM
**To:** Rupert, Melanie R. (melanierupert@paulhastings.com); Conca, David M. (davidconca@paulhastings.com); 'Tymoczko, Nicholas'
**Cc:** DG-Uceris; Jack Phillips (jcp@pgmhlaw.com); David A. Bilson (dab@pgmhlaw.com); Becker, Matthew J. (mbecker@axinn.com); Cosmo-Uceris-PH (Cosmo-Uceris-PH@paulhastings.com); Noreika, Maryellen;

'gfrischling@irell.com'; 'yjlu@irell.com'; Knight Brown, Delphine W. (dknightbrown@axinn.com)
(dknightbrown@axinn.com); Murata, Jason T.; Garrison, Brett M. (bgarrison@axinn.com); kkeller@shawkeller.com
**Subject:** Uceris Litigation (D. Del. Case Nos. 15-164 & 15-193)

Counsel:

I write regarding several issues concerning the upcoming trial in the Uceris case in the hopes that we can resolve or narrow potential disputes before the filing of the pretrial order.

First, Plaintiffs are currently asserting over 50 patent claims against Actavis and over 35 claims again Alvogen, many of which cover very similar subject matter.  Defendants request that Plaintiffs meaningfully reduce the number of asserted claims for trial in advance of the pretrial conference.  The parties should have clarity on the scope of the case that will actually be tried soon.  We look forward to discussing this issue with you during next week's meet and confer.  If we are unable to arrive at a means to narrow the scope of the claims asserted, we intend to raise this with the Court at the pretrial conference.

Second, Plaintiffs have included Dr. Lofberg's expert report on their exhibit list.  Please confirm by the end of Friday, April 14, 2017 whether Plaintiffs are seeking to admit into evidence or otherwise rely on paragraphs 18, 19, and 25-27 (and only those paragraphs) of Dr. Lofberg's report over Defendants' objections under the residual exception to hearsay FRE 807(a), per Andy Cochran's March 6, 2017 email.  If Plaintiffs do not intend to seek admission or otherwise rely on Dr. Lofberg's expert report at trial, or if Plaintiffs intentions with the report are not limited as described in the March 6, 2017 email, please let us know by Friday.

Third, in Plaintiffs' contentions, expert reports and statement of contested fact, Plaintiffs only have raised the doctrine of equivalents with respect to the "a lipophilic matrix consisting of lipophilic compounds with a melting point between 40° C. and 90° C. in which the active ingredient is at least partially inglobated" limitation of claims 1 and 4 of the '651 patent and claims 1 and 4 of the '799 patent.  Nevertheless, Plaintiffs have identified infringement, either literal or through the doctrine of equivalents, as an issue of law to be litigated for each patent in suit.  Please confirm by Friday that Plaintiffs do not intend to offer evidence or argument at trial or in their post-trial briefs about the doctrine of equivalents with respect to any other limitation the one identified above.

Finally, based on Plaintiffs' decision not to list any live fact witnesses on their witness list, we understand that Plaintiffs will not be calling the inventors of the patents-in-suit to testify or otherwise relying on their testimony.  If this understanding is incorrect, please let us know immediately.

Regards,

John T. Bennett



Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  (617) 570-8712
f  (617) 321-4359
JBennett@goodwinlaw.com | goodwinlaw.com

*****************************************************************
This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this

message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*********************************************************************

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Bennett, John T
**Cc:** Holland, Elizabeth J.; Sherry, Samuel; Marabella, Todd; Birbach, Naomi; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear John,

We write with a proposal for Actavis's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 4 of the '273 patent against Actavis;

- In exchange, Actavis will drop its entire invalidity cases against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Actavis but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

   o If Actavis is found not to infringe claim 5 of the '888 patent and claim 4 of the '273 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

   o If Actavis is found to infringe claim 5 of the '888 patent and/or claim 4 of the '273 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Actavis will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review.  We are available to discuss any questions that you may have.

Best regards,
Melanie

---



**Melanie R. Rupert | Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

**From:** Rupert, Melanie R. [mailto:melanierupert@paulhastings.com]
**Sent:** Wednesday, April 12, 2017 3:33 PM
**To:** Becker, Matthew J.
**Cc:** Knight Brown, Delphine W.; Conca, David M.; Cosmo-Uceris-PH; Frischling, Gary; Lu, Yite John; mnoreika@mnat.com
**Subject:** Uceris - Proposal for Trial

Dear Matt,

We write with a proposal for Alvogen's consideration to streamline the upcoming trial in the Uceris case:

- Plaintiffs will assert only claim 5 of the '888 patent and claim 22 of the '716 patent against Alvogen;

- In exchange, Alvogen will drop its entire invalidity case against all the presently asserted patents; and

- With respect to the other patents that are presently asserted against Alvogen but that will not be tried going forward, the parties will agree to be bound by a final decision from which no appeal can be taken as follows:

  o If Alvogen is found not to infringe claim 5 of the '888 patent and claim 22 of the '716 patent, that final decision of non-infringement will apply equally to the other patents that are no longer tried

  o If Alvogen is found to infringe claim 5 of the '888 patent and/or claim 22 of the '716 patent, that final decision of infringement will apply equally to the other patents that are no longer tried

Please let us know as soon as possible whether Alvogen will agree to this proposal in principle, and we will prepare an appropriate stipulation for your review.  We are available to discuss any questions that you may have.

Best regards,
Melanie

---



**Melanie R. Rupert** | **Partner, Litigation Department**
Paul Hastings LLP | 200 Park Avenue | New York, New York | 10166
212.318.6846 (d) | 212.318.6000 (m) | 212.230.7846 (f)
melanierupert@paulhastings.com | www.paulhastings.com

***********************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

For additional information, please visit our website at

# EXHIBIT 17

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 18

# REDACTED IN ITS ENTIRETY

# EXHIBIT 19

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 20

:56:54

1                  IN THE UNITED STATES DISTRICT COURT

2                  IN AND FOR THE DISTRICT OF DELAWARE

3                              -   -   -

4    PFIZER INC. and UCB PHARMA GMBH,)      Civil Action
                                     )
5                 Plaintiffs,        )
                                     )
6          v.                        )
                                     )
7    ALKEM LABORATORIES LTD., et al.,)
                                     )       NO. 13-1110(GMS)
8                 Defendants.        )       CONSOLIDATED

9                              -   -   -

10                        Wilmington, Delaware
                         Wednesday, July 15, 2015
11                            9:00 a.m.
                            Day 3 of Trial
12
                               -   -   -
13
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
     APPEARANCES:
15
                 JACK B. BLUMENFELD, ESQ.
16               Morris Nichols Arsht & Tunnell LLP
                        -and-
17               JAMES S. TRAINOR, JR., ESQ.,
                 JEFFREY J. OELKE, ESQ.,
18               ROBERT E. COUNIHAN, ESQ.,
                 RYAN JOHNSON, ESQ., and
19               LAURA MORAN, ESQ.
                 White & Case LLP
20               (New York, NY)

21                              Counsel for Plaintiffs

22

:22:24   23

:33:40   24

25

```
 1    APPEARANCES CONTINUED:

 2            KELLY E. FARNAN, ESQ.
              Richards, Layton & Finger, P.A.
 3                        -and-
              RACHEL K. HUNNICUTT, ESQ., and
 4            NEAL SETH, ESQ.
              Wiley Rein LLP
 5            (New York, NY)
                              Counsel for Defendant
 6                            Alkem Laboratories Ltd.

 7            ADAM W. POFF, ESQ., and
              PILAR KRAMAN, ESQ.
 8            Young Conaway Stargatt & Taylor LLP
                        -and-
 9            KRISTEN VINK VENEGAS, ESQ., and
              SHON LO, ESQ.
10            McDermott Will & Emery LLC
              (Chicago, IL)
11                            Counsel for Defendant Sandoz Inc.

12            KELLY E. FARNAN, ESQ., and
              CHRISTINE HAYNES, ESQ.
13            Richards, Layton & Finger, P.A.
                        -and-
14            MICHAEL R. DZWONCZYK, ESQ.,
              RENITA A. RATHINAM, ESQ., and
15            ALTON L. HARE, ESQ.
              Sughrue Mion, PLLC
16            (Washington, D.C.)
                              Counsel for Defendant/
17                            Counterclaimant Accord
                              Healthcare Inc., USA and
18                            Defendant Amneal Pharmaceuticals,
                              Inc.
19
              J. CLAYTON ATHEY, ESQ.
20            Prickett, Jones & Elliott, P.A.
                        -and-
21            WILLIAM D. HARE, ESQ., and
              GABRIELA MATERASSI, ESQ.
22            McNeely, Hare & War LLP
              (Princeton, N.J.)
23
                              Counsel for Defendants
24                            Amerigen Pharmaceuticals, Inc.
                              and Amerigen Pharmaceuticals Ltd.
25
```

| | | |
|---|---|---|
| :03:41 | 1 | THE COURT:  Good morning. |
| :03:42 | 2 | (Counsel respond "Good morning.") |
| :03:44 | 3 | THE COURT:  Please take your seats, counsel. |
| :03:48 | 4 | Continue. |
| :03:50 | 5 | MS. LO:  Good morning, Your Honor.  Shon Lo on |
| :03:52 | 6 | behalf of defendants. |
| :03:54 | 7 | May it please the Court, defendants next witness |
| :03:56 | 8 | is Dr. Bengt Sparf.  He is the co-inventor of four of the |
| :04:00 | 9 | five asserted patents.  He will be appearing by deposition. |
| :04:09 | 10 | THE COURT:  Okay.  That's an important thing to |
| :04:22 | 11 | know, counsel. |
| :04:23 | 12 | "Question:  Good morning, sir.  Could you please |
| :04:35 | 13 | state your name and address for the record. |
| :04:40 | 14 | "Answer:  Bengt Sparf, and I have a consultant |
| :04:43 | 15 | company named Compharma AB. |
| :04:48 | 16 | "Question:  And what is the address? |
| :04:49 | 17 | "Answer:  The address is Trangsund outside |
| :04:52 | 18 | Stockholm. |
| :04:52 | 19 | "Question:  That is in Sweden, Stockholm, |
| :04:55 | 20 | Sweden? |
| :04:55 | 21 | "Answer:  Stockholm, Sweden. |
| :04:57 | 22 | "Question:  Will you do your best to answer my |
| :04:59 | 23 | questions fully and accurately today? |
| :05:01 | 24 | "Answer:  If I will do my best?  Of course. |
| :05:03 | 25 | "Question:  Thank you.  I would like to mark as |

Sparf - depo.

:44:16  1  of the deposition as well as defendants' prima facie case on

:44:19  2  invalidity.  We do reserve our right to call our witnesses

:44:22  3  in rebuttal to anything plaintiffs may put on.  I pass.

:44:28  4       MR. OELKE:  Your Honor, plaintiffs move under

:44:30  5  Rule 52(c) as to defendants' obviousness defenses as to all

:44:37  6  patents.  We move under Rule 52(c) as to their anticipation

:44:41  7  defenses on the '650 patent and indefiniteness defenses on

:44:45  8  the '650 patent.  I would be happy to discuss it more, if

:44:49  9  you wish.

:44:53  10       THE COURT:  See if you can do so in a somewhat

:44:58  11  summary fashion.  We may take a break after I hear from both

:45:02  12  sides on the point and may come back and ask for further

:45:06  13  discussion.

:45:07  14       Let's see where we go with it.

:45:09  15       MR. OELKE:  Your Honor, as to the four compound

:45:14  16  patents, the '980 patent, the '230 patent, the '772 patent

:45:18  17  and the '478 patent, defendants only defense is obviousness.

:45:24  18  It's limited to obviousness of the compound fesoterodine.

:45:28  19  Defendants have failed to offer clear and convincing

:45:32  20  evidence as to this compound, for a number of reasons.

:45:38  21       One reason, they failed to identify a proper

:45:42  22  combination of prior art references that would render

:45:46  23  fesoterodine obvious as of the priority date of the compound

:45:51  24  patents.

:45:55  25       They instructed their experts to start with

Sparf - depo.

1  tolterodine or 5-HMT, which means they were not considering

2  the full scope and content of the prior art as a lead

3  compound or as a starting point.

4          They failed to identify any prior art concerning

5  prodrugs that in any way relate to tolterodine 5-HMT

6  antimuscarinics or OAB drugs of any sort.

7          And finally, their only expert that discussed

8  the particular chemistry did not state that the person of

9  ordinary skill in the art would have made the specific

10  molecular modifications to come up with fesoterodine from

11  5-HMT.  He only stated that a person of ordinary skill would

12  try a group of compounds and test them.

13          This is not meeting the standard of specific

14  molecular modifications with a reasonable expectation of

15  success.

16          That's the obviousness argument, Your Honor.

17  That applies to all patents.  It would also apply to the

18  '650 patent.

19          As to their anticipation argument, the only

20  argument that they even made was that the '212 publication

21  anticipates the asserted claims of the '650 patent.  But

22  that publication is two days after the priority date of the

23  '650 patent.

24          They have argued that there was a request -- an

25  admission in the specification by the inventor.  But it is

Sparf - depo.

1    clear, prior art by admission cannot be when an inventor

2    cites to his own work that is not prior art by any statutory

3    basis.

4          So they did not carry their burden by clear and

5    convincing evidence of anticipation of the asserted claims

6    of the '650 patent.

7          And then finally, as to indefiniteness of Claim

8    5, defendants fail to meet their burden by clear and

9    convincing evidence that that claim was indefinite.  In

10   fact, they stipulated that that claim was infringed.

11              THE COURT:  Okay.  Thank you.

12              MR. OELKE:  Thank you, Your Honor.

13              MR. DZWONCZYK:  Good morning, Your Honor.

14              Responding to Mr. Oelke's 52(c) motion, we

15   obviously disagree.  What we heard over the past couple of

16   days was a specific combination of references.  You heard

17   about the various Nilvebrant references.  You have heard

18   about the '269 references.  You have heard some very

19   specific teachings and combinations from those references

20   that would have led a person unmistakably to start with

21   5-HMT based on its activity, its potency, and everything

22   that was known about that particular prior art compound.

23              We have not yet heard from anyone on secondary

24   considerations.  We recognize that, even though Graham v.

25   John Deere teaches us it should all be considered in the

:49:25   1    mix, it is our burden to set forth a prima facie case.  We

:49:30   2    believe Drs. Mayersohn and Sloan have set forth a sufficient

:49:33   3    basis of why a person skilled in the art would have gone

:49:35   4    immediately to 5-HMT.

:49:38   5          With regard to anticipation, to be certain, the

:49:43   6    anticipation defense is not based on the publication of the

:49:46   7    '212 application on November 18, 1999.  It's based on the

:49:52   8    admission in the '650 patent Claim 1 that the compounds, the

:49:59   9    novel 3,3-diphenylpropylamines of that reference were known.

:50:03  10    And you heard the evidence that fesoterodine hydrochloride

:50:07  11    is disclosed in that patent.

:50:09  12          An admission by the patentee that compounds were

:50:14  13    known renders those known compounds prior art.

:50:18  14          So it is really just a legal disagreement that

:50:20  15    we have, Your Honor.  There is not a factual disagreement.

:50:23  16    And the case law has been set forth in the pretrial order.

:50:26  17          We think the 52(c) motion is improper.

:50:29  18          With respect to the --

:50:31  19          THE COURT:  Why is the 52(c) motion improper on

:50:34  20    this point?

:50:38  21          MR. DZWONCZYK:  It is a question of law, Your

:50:40  22    Honor.  If Your Honor decides in their favor --

:50:43  23          THE COURT:  Procedurally, it is not.

:50:46  24          MR. DZWONCZYK:  I am sorry, Your Honor.  I

:50:47  25    agree.

Sparf - depo.

:50:48    1          With respect to indefiniteness of Claim 5, we

:50:51    2    disagree.  We believe we have carried our burden of showing

:50:56    3    that Claim 5 is indefinite based on the standards, the legal

:50:59    4    standards of indefiniteness by the Supreme Court, because it

:51:02    5    fails to reasonably convey with certainty what the scope of

:51:06    6    the claim is.

:51:07    7          You have heard testimony that there is a comma

:51:09    8    separating those two salts.  And we simply don't know what

:51:14    9    the scope is.  The plaintiffs and defendants agree that two

:51:18   10    compounds are recited --

:51:20   11          THE COURT:  Somebody in this litigation seems to

:51:22   12    know what it is.  There has been a stipulation.

:51:23   13          MR. DZWONCZYK:  Let me talk about that.

:51:25   14          The stipulations are on the docket, Your Honor.

:51:28   15    Some of the language has been redacted, but some has not.

:51:31   16    Most if not all of the stipulations contain a footnote,

:51:35   17    making the stipulation of Claim 45 contingent upon the, not

:51:39   18    the construction, but Your Honor's ruling on that claim,

:51:41   19    because all of the parties, ANDAs, Abbreviated New Drug

:51:46   20    Applications, only have one of those compounds.

:51:48   21          The stipulation was contingent on Your Honor's

:51:51   22    determination that only one would be required to infringe.

:51:55   23    To the extent Your Honor determined that the claim really

:51:57   24    required two compounds, obviously, none of the defendants'

:52:02   25    ANDAs are seeking approval to market two compounds, so we

Sparf - depo.

:52:06  1   don't.

:52:08  2              To be certain, the stipulations were

:52:10  3   conditional.

:52:11  4              THE COURT:  All right.

:52:12  5              MR. DZWONCZYK:  For those reasons, we oppose the

:52:14  6   motion.

:52:15  7              THE COURT:  Did you want to say anything else,

:52:16  8   Mr. Oelke?

:52:17  9              MR. OELKE:  Your Honor, one last point on that

:52:24  10  stipulation.

:52:24  11             If they wanted to make the argument that they

:52:28  12  required both compounds in the claim, then they would have

:52:31  13  had a noninfringement defense.  None of these defendants do.

:52:35  14             THE COURT:  That seems apparent.

:52:37  15             I will take another look at the footnote.

:52:41  16             MR. OELKE:  I have been told one defendant does

:52:43  17  not have that footnote, just to be clear.

:52:45  18             Thank you, Your Honor.

:52:46  19             THE COURT:  All right.  So let's take a little

:52:50  20  recess.

:52:50  21             (Recess taken.)

:04:22  22             THE COURT:  Let's take our seats.

:04:26  23             Mr. Oelke, I am going to deny the 52(c) motion

:04:31  24  on obviousness.  I think they have made the prima facie case

:04:35  25  and you are going to have to put on evidence.

Sparf - depo.

| | | |
|---|---|---|
| :04:37 | 1 | I expect later on today to rule on the |
| :04:43 | 2 | anticipation motion.  And I am going to reserve on |
| :04:48 | 3 | indefiniteness at this point.  Okay? |
| :04:50 | 4 | MR. OELKE:  Thank you, with Your Honor. |
| :04:53 | 5 | MR. DZWONCZYK:  Thank you. |
| :05:05 | 6 | THE COURT:  I do have a question.  Dr. Sparf -- |
| :05:08 | 7 | I am assuming you were unable to secure his attendance here |
| :05:11 | 8 | at trial. |
| :05:11 | 9 | MR. OELKE:  That's correct, Your Honor. |
| :05:13 | 10 | THE COURT:  Do I read correctly that it was a |
| :05:16 | 11 | videotape deposition? |
| :05:20 | 12 | MR. OELKE:  I believe so. |
| :05:22 | 13 | MR. COUNIHAN:  Yes, it was videotaped. |
| :05:26 | 14 | THE COURT:  Do you have the DVD? |
| :05:28 | 15 | MR. OELKE:  Yes. |
| :05:29 | 16 | THE COURT:  We would like to have it. |
| :05:33 | 17 | MR. OELKE:  Yes. |
| :05:38 | 18 | THE COURT:  Not at this moment.  Whenever you |
| :05:39 | 19 | get around to it. |
| :06:13 | 20 | Ms. VENEGAS:  Good morning.  Your Honor. |
| :06:15 | 21 | Kristen Venegas on behalf of the defendants.  We understand |
| :06:17 | 22 | that plaintiffs next witness will be Dr. Nitti.  If you |
| :06:23 | 23 | recall our discussion earlier in the week, Sandoz -- maybe |
| :06:26 | 24 | you don't, I will refresh your recollection.  Sandoz is the |
| :06:30 | 25 | only defendant who is still contesting the infringement of |

:04:21  1    think we are going to need with the witness?  That will

:04:24  2    determine how much longer we are going to go today.

:04:27  3                    MS. RATHINHAM:  I would say like 25 minutes.

:04:32  4                    THE COURT:  Doctor, are you able to stay?

:04:36  5                    THE WITNESS:  Yes, Your Honor.

:04:37  6                    THE COURT:  Counsel.

:04:38  7                    MR. OELKE:  That is fine, Your Honor.

:04:39  8                    THE COURT:  Let's resume this tomorrow.  It's

:04:44  9    been a long day.

:04:46  10                   Doctor, you are excused for the day.

:04:48  11                   Counsel should remain.  I am going to announce

:04:50  12   the ruling.

:04:51  13                   Then I would like to see counsel for a moment

:04:54  14   off the record at sidebar.

:05:06  15                   (Witness steps down from stand.)

:05:08  16                   THE COURT:  I promised I would at the end of the

:05:10  17   day give you my ruling on Mr. Oelke's 52(c) motion on

:05:15  18   anticipation.  I am going to grant the motion for the

:05:18  19   following reasons.

:05:20  20                   The defendants contend that the '650 patent is

:05:24  21   anticipated by so-called admitted prior art in the '650

:05:30  22   patent specification.  In particular, the specification

:05:32  23   states:  From document PCT/EP99/03212, novel derivatives of

:05:47  24   3,3-diphenylpropylamines are known.  A parenthetic reference

:05:58  25   is Column 1.  I believe that's Line 11, Column 1, at Lines

:06:08    1    15 through 16.

:06:10    2           The defendants cite an accurate statement of

:06:14    3    law, and I will quote, "A statement in a patent that

:06:17    4    something is in the prior art is binding on the applicant

:06:22    5    and patentee for determinations of anticipation and

:06:24    6    obviousness.

:06:26    7           That quote comes from the Constant v. Advanced

:06:29    8    Micro-Devices, Inc. case, which can be found at 848 F.2d

:06:35    9    1560.  The jump site is 1570.  That is a 1988 CAFC case.

:06:41   10           As the plaintiffs points out, however, patent

:06:43   11    references to an inventor's own work do not fall under the

:06:47   12    umbrella of admitted prior art.  Indeed, the Federal

:06:51   13    Circuit's Riverwood International case summarizes the

:06:54   14    controlling law, this is a parenthetic statement, (and, in

:06:59   15    the process, specifically distinguishes cases cited by the

:07:01   16    defendants.

:07:04   17           This is a quote:

:07:05   18           "While Nomiya and Fout stand for the proposition

:07:12   19    that a reference can become prior art by admission, that

:07:15   20    doctrine is inapplicable when the subject matter at issue is

:07:19   21    the inventor's own work."

:07:21   22           Continuing along with the quote:

:07:22   23           "One's own work may not be considered prior art

:07:25   24    in the absence of a statutory basis, and a patentee should

:07:27   25    not be 'punished' for being as inclusive as possible.'

:07:32    1          I think, to rule to the contrary it would invite

:07:37    2     mischief to various patent agencies around the world,

:07:40    3     specifically the U.S. PTO.   The cite is Riverwood

:07:44    4     International Corp. v. R.A. Jones & Company.   324 F.3d 1346.

:07:51    5     Pin cite 1354-1355.

:07:54    6          There appears to be no dispute that the cited

:07:58    7     document, the '212 application, is the work of the inventor

:08:00    8     of the '650 patent:  Claus Meese.   The relevant passage from

:08:05    9     the '650 specification does not say that novel derivatives

:08:10   10     of -- I won't try to pronounce it again -- the compound in

:08:15   11     question, the 3,3 compound are known generally but, rather,

:08:19   12     they are known from the '212 application, Dr. Meese's work.

:08:24   13     The defendants have not offered an alternative statutory

:08:27   14     basis for treating the '212 application as prior art.

:08:31   15     Indeed, the only evidence presented shows that the priority

:08:34   16     date of the '650 patent, November 16, 1999, predates the

:08:38   17     publication date of the '212 application, November 18, 1999.

:08:42   18          The defendants' highlighted statement does not

:08:45   19     constitute admitted prior art.   The case law is clear that

:08:48   20     an inventor's own work cannot be prior art without a

:08:51   21     statutory basis under Section 102, even if the patentee

:08:55   22     explicitly refers to the work as "prior art."

:08:58   23          See See Reading & Bates Construction Company v.

:09:06   24     Baker Energy Res. Corp., 748 F.2d 645, 650, Federal Circuit

:09:11   25     1984.   Thus, the '650 patent is not anticipated.

:09:14     1                    I would like to see counsel at sidebar.

:09:17     2                    (sidebar conference off the record.)

:11:50     3                    (Court recessed.)

:11:50     4                                     -   -   -

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHIRE DEVELOPMENT LLC., SHIRE )
PHARMACEUTICAL DEVELOPMENT, )
INC., COSMO TECHNOLOGIES LIMITED, )
and GIULIANI INTERNATIONAL )
LIMITED, )
                         )      Civil Action No. 10-581 (KAJ)
           Plaintiffs, )
                         )         **REDACTED**
      v. )
                         )
CADILA HEALTHCARE LIMITED (d/b/a )
ZYDUS CADILA) and ZYDUS )
PHARMACEUTICALS (USA) INC., )
                         )
           Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Frederick L. Cottrell, III, Esq., Jason J. Rawnsley, Esq., Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, DE 19801, *Counsel for Shire*
      Of Counsel:    Edgar H. Haung, Esq., Sandra Kuzmich, Ph.D., Esq., Andrew Wasson, Esq. Elizabeth J. Murphy, Esq., Frommer Lawrence & Haug LL, 745 Fifth Avenue, New York, NY 10151

John C. Phillips, Jr., Esq., David A. Bilson, Esq., Phillips, Goldman & Spence, P.A., 1200 North Broom Street, Wilmington, DE 19806, *Counsel for Defendants*
      Of Counsel:    Michael J. Gaertner, Esq., Keith D. Parr P.C., Esq., James T. Peterka, Esq., David B. Abramowitz, Esq., Andy J. Miller, Esq., Locke Lord LLP, 111 S. Wacker Drive, Chicago, IL 60606
                  Andrea L. Wayda, Locke Lord LLP, Three World Financial Center, New York, NY 10281-2101

---

September 16, 2016
Wilmington, Delaware

**JORDAN, Circuit Judge**[1]

## I.    INTRODUCTION

In this patent infringement case, Shire Development LLC, Shire Pharmaceutical

Development Inc., Cosmo Technologies Limited, and Nogra Pharma Limited

(collectively "Shire") has sued Cadila Healthcare Ltd. and Zydus Pharmaceuticals (USA)

Inc. (collectively "Zydus")[2] over Zydus's Abbreviated New Drug Application ("ANDA")

seeking FDA approval to manufacture, use, and sell a generic equivalent of a Shire

pharmaceutical product named Lialda® ("Lialda").  Lialda is a delayed-release

mesalamine tablet used to treat ulcerative colitis.  Shire seeks a declaratory judgment of

infringement of U.S. Patent No. 6,773,720 ("the '720 patent"), entitled "Mesalazine

Controlled Release Oral Pharmaceutical Compositions."  Zydus denies that its ANDA

product infringes the '720 patent.  The parties presented evidence at a four-day bench

trial from March 28 to March 31, 2016.  The following, issued pursuant to Federal Rule

of Civil Procedure 52(a), constitutes my findings of fact and conclusions of law on the

issue of infringement.[3]

---

[1] Sitting by designation (Docket Item ("D.I.") 27).

[2] For convenience, I will refer to the plaintiffs and the defendants in the singular, except where otherwise noted.

[3] The validity and enforceability of the patent are not at issue.  Throughout these Findings of Fact and Conclusions of Law, I may have adopted, without attribution, language proposed by one side of this dispute.  In all such instances, the findings or conclusions in question have become my own, based on my review of the evidence and the law.  To the extent that any of my findings of fact may be considered conclusions of law, or vice versa, they should be considered as such.

## II.    FINDINGS OF FACT

### A.    *The Parties*

1.       Shire Development LLC (formerly Shire Development Inc.) is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 735 Chesterbrook Boulevard and 1200 Morris Drive, in Wayne, Pennsylvania 19087.  (Statement of Uncontroverted Facts, D.I. 407 Ex. 1 at ¶ 1.) Shire Pharmaceutical Development Inc. is a corporation organized and existing under the laws of the State of Maryland, having its principal place of business at 1801 Research Boulevard in Rockville, Maryland 20850.  (*Id.* at ¶ 2)  Cosmo Technologies Ltd. ("Cosmo") is a company organized and existing under the laws of Ireland, having its principal place of business at The Connolly Building, 42-43 Amiens Street in Dublin, Ireland.  (*Id.* at ¶ 3.)  Nogra Pharma Ltd. ("Nogra") (formerly known as Giuliani International Limited) is a company organized and existing under the laws of Ireland, having its principal place of business at 33 Sir John Rogerson's Quay in Dublin, Ireland. (*Id.* at ¶ 3.)

2.       Shire has an exclusive sublicense from Nogra under the patent in suit, and Nogra in turn has an exclusive license from Cosmo, the patent owner.[4]  (*Id.* at ¶ 10.)

---

[4] Cosmo's ownership of the patent stems from an assignment by Cosmo S.p.A, which obtained the patent on assignment from inventors Roberto Villa, Massimo Pedrani, Mauro Ajani, and Lorenzo Fossati.  (Statement of Uncontroverted Facts, D.I. 407 Ex. 1 at ¶ 7.)  Although Shire is neither an owner nor an assignee of the patent in suit, it nevertheless has standing to sue under that patent as an exclusive licensee. *See, e.g.*,

3.      Cadila Healthcare Limited ("Cadila") is a company organized and existing under the laws of India, having its principal place of business at Zydus Tower, Satellite Cross Roads, Ahmedabad-380015 in Gujarat, India.   (*Id.* at ¶ 5.)   Zydus Pharmaceuticals (USA) Inc. ("Zydus USA") is a corporation organized  and existing under the laws of New Jersey, having its principal place of business at 73 Route 31 N. in Pennington, New Jersey 08534.   (*Id.* at ¶ 6.)  The parent company for Zydus USA is Zydus International Pvt. Ltd. Ireland, which is owned by Cadila.   (*Id.*)

    *B.      Procedural Background*

4.      Shire is the owner of New Drug Application ("NDA") No. 22-000.   (*Id.* at ¶ 14.)   That NDA, approved by the FDA in January 2007, covers 1.2g delayed-release mesalamine tablets marketed under the name Lialda.   (*Id.*)  Mesalamine, the active ingredient in Lialda, is also referred to as "5-aminosalicylic acid" or "mezalamine."   (*Id.* at ¶ 15.)  Lialda is indicated for the treatment of ulcerative colitis, a disease characterized by inflammation of the lower gastrointestinal tract.   (*Id.* at ¶ 16-17.)

5.      The FDA lists Lialda as associated with the '720 patent in its publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (also known as the "Orange Book").   (*Id.* at ¶ 18.)

6.      Zydus submitted ANDA No. 91-640 (the "ANDA") to the FDA under section 505(j) of the Federal Food, Drug, and Cosmetic Act (codified at 21 U.S.C.

---

*Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998) (affirming that "all substantial rights under the patent have been transferred in the form of an exclusive license, … the licensee [is] the virtual assignee" and thus is "accorded standing.")

§ 355(j)), seeking approval to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of generic mesalamine delayed-release tablets, 1.2g (the "Zydus ANDA product" or "ANDA product") before the expiration of the '720 patent. (*Id.* at ¶ 19.) The ANDA contains data for the purpose of establishing bioequivalence to Lialda, which the ANDA identifies as the Reference Listed Drug. (*Id.*) The ANDA identifies Cadila as the manufacturer of the proposed ANDA product. (*Id.* at ¶ 23.)

7.     Included in the ANDA was Zydus's certification, made pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), that the proposed manufacture, use, sale, offer for sale, or importation of the Zydus ANDA product would not infringe any valid claim of the '720 patent (the "Paragraph IV certification"). (*Id.* at ¶ 20.)

8.     In May, 2010 Zydus notified Shire that it had filed the ANDA and that the ANDA included the Paragraph IV certification with respect to the '720 patent. (*Id.* at ¶ 22.) Shire responded in July 2010 by filing this lawsuit, alleging infringement against both Zydus USA and Cadila under 35 U.S.C. § 271(e)(2)(A) as well as contributory and induced infringement against Cadila under 35 U.S.C §§ 271(b) and 271(c), respectively. (D.I. 1 (Complaint)). Shire seeks a declaratory judgment that the commercial manufacture, use, sale, offer for sale and/or importation into the United States prior to the expiration of the '720 patent of any products associated with the ANDA would constitute an act of infringement.

C.     *The '720 Patent*

9.     The only patent at issue in this suit is the '720 patent. The application for that patent, No. 10/009,491 was filed June 8, 2000. (Statement of Uncontroverted Facts,

D.I. 407 Ex. 1 at ¶ 8.)  It was based on PCT/EP00/05321,[5] which in turn was predicated

on, and claimed its priority from, a previously filed Italian Patent Application

M199A1316.  (*Id.*)  Titled "Mesalazine Controlled Oral Pharmaceutical Compositions,"

the '720 patent was ultimately issued by the United States Patent and Trademark Office

on August 10, 2004 and will expire on June 8, 2020.  (*Id.* at ¶ 7-9.)

10.     The patent contains four claims.  Shire alleges infringement of only Claim

1 and Claim 3.  (*Id.* at ¶ 11.)

11.     Claim 1 of the patent reads:

> Controlled-release oral pharmaceutical compositions containing as an active ingredient 5-amino-salicylic acid, comprising:
>     a) an inner lipophilic matrix consisting of substances selected from the group consisting of unsaturated and/or hydrogenated fatty acid, salts, esters or amides thereof, fatty acid mono-, di- or triglycerids, waxes, ceramides, and cholesterol derivatives with melting points below 90° C., and wherein the active ingredient is dispersed both in said the [sic] lipophilic matrix and in the hydrophilic matrix;
>     b) an outer hydrophilic matrix wherein the lipophilic matrix is dispersed, and said outer hydrophilic matrix consists of compounds selected from the group consisting of polymers or copolymers of acrylic or methacrylic acid, alkylvinyl polymers, hydroxyalkyl celluloses, carboxyalkyl celluloses, polysaccharides, dextrins, pectins, starches and derivatives, alginic acid, and natural or synthetic gums;
>     c) optionally other excipients; wherein the active ingredient is present in an amount of 80 to 95% by weight of the total composition, and wherein the active ingredient is dispersed both in the lipophilic matrix and in the hydrophilic matrix.

(*Id.*)

12.     Claim 3 depends from Claim 1, covering "[c]ompositions as claimed in

claim 1, in the form of tablets, capsules, minitablets."  (*Id.*)

---

[5] This number identifies a patent application filed with the European Patent Office under the Patent Cooperation Treaty and establishes its priority date.

13.     Zydus concedes that its ANDA product meets a number of the limitations of Claim 1, namely, that it is an oral pharmaceutical composition, that it contains 1.2 grams of the active ingredient mesalamine, also known as "5-amino-salicylic acid," which makes up between 80% and 95% of the weight of the product, and that it is a controlled-release composition.   (*Id.* at ¶ 24-27.)  The Zydus ANDA product is also a tablet, and thus would infringe Claim 3 if it were found to infringe Claim 1.   (*Id.* at ¶ 19; PTX-208.14.)

14.     The remaining limitations are contested by the parties.  Specifically, the parties dispute whether the Zydus ANDA product includes an inner lipophilic matrix (including both the structure and composition of said matrix and the melting point of the substance or substances comprising it), an outer hydrophilic matrix, and mesalamine dispersed within both the inner and outer matrices.[6]

D.     *The Zydus ANDA Product*

15.     In support of its infringement contentions, Shire put on substantial evidence as to the Zydus ANDA manufacturing process and product.

16.     Before discussing the process itself, there are two compounds used in the product that warrant further discussion, as their properties and function in the process and resulting product inform my conclusions.

---

[6] Both sides continue, at least facially, to dispute nearly every facet of Claim 1 not covered by their stipulation of uncontroverted facts.  However, as discussed below, the major points of contention surround the inner lipophilic matrix limitation found in Claim 1(a).

17.     The first is mesalamine, the active ingredient in both Lialda and the ANDA product.  Mesalamine is a low density compound that is difficult to compress into tablets. (DTX 17 at ZYDUS_MES0023452, Trial Tr. at 916:9-917:8 (Banakar[7]).)   It is also hydrophilic in nature.  (DTX 17 at ZYDUS_MES0023425; Trial Tr. at 936:14-937:9 (Banakar).)

18.     Magnesium stearate is a magnesium salt of stearic acid, a long chain fatty acid with 18 carbon atoms.  Its sister molecule, magnesium palmitate, is a magnesium salt of palmitic acid, a long chain fatty acid with 16 carbon atoms.  (Trial Tr. 661:22-662:8 (Hollingsworth[8]).)  Both magnesium stearate and magnesium palmitate can exist in two different forms – a hydrated form, in which the molecule's crystalline structure incorporates water molecules, and an anhydrous form, in which it does not.  The compound used by Zydus in its ANDA product (for simplicity I will refer to the compound simply as "magnesium stearate") contains both magnesium stearate and magnesium palmitate, each in its hydrated form.[9]  (Trial Tr. 257:3-21 (Hanton[10]).)

---

[7] Dr. Umesh Banakar was Zydus's infringement expert.  He is a retired professor and a technical consultant to the pharmaceutical industry.  (Trial Tr. 895:7-896:16.)  He was accepted as an expert in the areas of pharmaceutical formulation and evaluation, including controlled release technology and dissolution testing.  (*Id.* at 899:24-900:5.)

[8] Dr. Mark D. Hollingsworth is an associate professor of chemistry at Kansas State University.  (Trial Tr. 657:5-6.)  He was accepted as an expert on behalf of Zydus in the field of solid state chemistry and the thermal analysis of organic and pharmaceutical compounds.  (*Id.* at 661:2-9.)

[9] The magnesium stearate used by Zydus contains 65.5% magnesium stearate and 33.4% magnesium palmitate, with the remaining 1.1% distributed among various impurities.  (PTX-644, Trial Tr: 296:16-297:6 (Pinal).)

19.     Magnesium stearate is commonly used as an excipient in pharmaceutical manufacturing and can serve as a lubricant. (Trial Tr: at 208:16-21 (Little[11]).) In addition to its utility as a lubricant, magnesium stearate is also known to be lipophilic. (Trial Tr. at 390:12-23 (Sinko[12]) (quoting *Handbook Of Pharmaceutical Excipients* 281 (2d ed. 1994) for the proposition that "magnesium stearate is hydrophobic[13] and may retard the dissolution of a drug from a solid dosage form,"); *Id.* at 391:15-392:19 (Sinko); *Id.* at 986:11-14 (Banakar) (confirming that "magnesium stearate is known to be hydrophobic, water insoluble, and water repellent,"); *Id.* at 987:2-16 (Banakar) (confirming that his own book[14] states that "magnesium stearate, a lubricant, commonly

---

[10] Dr. Scott D. Hanton is a Lab Operations Manager and Chief Scientest at Intertek Allentown. (PTX-549.) He was accepted as an expert on behalf of Shire in chemical analysis and analytical techniques. (Trial Tr. 254:9-13.)

[11] Dr. Steven R. Little is a professor as well as the Director of the Controlled Release and Biomedical Research Laboratories at the University of Pittsburgh. (Trial Tr. 166:23-164:7.) He was accepted as an expert for Shire in the field of controlled release formulation and testing. (*Id.* at 169:25-170:5.)

[12] Dr. Patrick J. Sinko is a professor at the Ernest Mario School of Pharmacy at Rutgers University, as well as being Associate Vice President for Research. (PTX-840.) He was accepted as an expert witness for Shire in the field of pharmaceutical science and formulation. (Trial Tr. 373:19-24.)

[13] Many of the statements made about magnesium stearate by both parties refer to it as hydrophobic rather than lipophilic. While these terms are treated by the parties as synonymous, it is not clear from any testimony or other evidence that they are perfectly interchangeable. Because Zydus has raised no challenge on this point, however, I credit Shire's assertions that magnesium stearate is lipophilic based on evidence of the compound's hydrophobic properties.

[14] The publication is Michael C. Makoid, Phillip J. Vuchetich, and Umesh V. Banakar, *Basic Pharmacokinetics* 8-6 (1996).

used in tablet and capsule formulations, is water-insoluble and water repellent.  Its

hydrophobic nature tends to retard drug dissolution").)

20.     Sushrut Krishnaji Kulkarni[15] testified via videotaped deposition about the

composition and manufacturing process for the Zydus ANDA product.[16]  He had been

involved in a supervisory capacity in the development of the ANDA product.  (Trial Tr.

80:15-81:6.)

21.     At a high level of generality, the manufacturing process, as described by

Mr. Kulkarni and borne out by several exhibits, includes three principal steps:

compaction (also known as dry granulation), wet granulation, and lubrication.  (Trial Tr.

82:22-83:5; DTX 17 at ZYDUS_MES0023436, ZYDUS_MES0023458-60; PTX-844.7.)

After those steps are completed, the combined product is compressed into tablets and

coated.[17]

22.     In the first step, ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.  (PTX-287.4; DTX 17 at

_____

[15] Mr. Kulkarni is a Senior Vice President at Zydus and served as a Rule 30(b)(6)
witness for the company.  (Trial Tr. 79:22-81:10.)

[16] Specifically, he testified concerning the composition and manufacturing process
for a batch of test product identified as EMM196, but he confirmed that the statements
made in the ANDA about the anticipated ANDA product applied to batch EMM196.
(Trial Tr. 82:7- 84:13.)

[17] These latter coatings do not factor into Shire's infringement contentions, so that
step is only briefly mentioned herein.  Likewise, the compression step is immaterial to the
present dispute and warrants only passing reference.
[18] For simplicity, all weights are per-tablet.

ZYDUS_MES0023436, ZYDUS_MES0023458-60.)  This results in a mixture that is

███████████████████████████████████████████████, by weight.

23.     Kiran Hothur[19] testified that magnesium stearate was used in the

compaction phase in order to prevent the mesalamine mixture from sticking to the rollers.

(Trial Tr. at 539:11-541:16.)

24.     The roll compaction produces a "ribbon" of the mixture, which is then

"sized" into granules by an oscillating granulator, a machine which breaks up the ribbon

into granules and allows only those granules 0.8 mm in diameter and smaller to pass

through.  (Trial Tr. at 89:12-90:25, 91:1-17 (Kulkarni); *Id.* at 381:3-16, 386:18-388:1

(Sinko); *Id.* at 984:6-985:10 (Banakar); PTX-208.37; PTX-287.39, 44.)  In addition to the

granules, this process also produces "fines," which are significantly smaller than the

granules.  (Trial Tr. at 99:10-17 (Kulkarni).)  After compaction, the density of the

material is measured.  If it is insufficiently dense to meet specifications, the roll

compaction step is repeated.  (Trial Tr. 482:10-483:8 (Sinko); DTX 18 at

ZYDUS_MES0235700-ZYDUS_MES0235701.)

25.     The appropriately sized granules and fines that are produced during

compaction then proceed to the wet granulation phase.  First, █████████████████████████

███████████████████████████████████████████████████████████████

---

[19] Mr. Hothur was designated by Zydus as a 30(b)(6) witness on the development
of the Zydus ANDA product.  (Trial Tr. 536:25-537:9.)

[20] A release retardant is an excipient that plays some role in controlling the release
of the active ingredient from the product.  (Trial Tr. 87:10-18 (Kulkarni).)



[21] (DTX 17 at ZYDUS_MES0023436, ZYDUS_MES0023459.)

(*Id.* at ZYDUS_MES0023459)

26.     The product of that process is then ▮▮▮▮▮▮▮▮▮▮. (*Id.*)  The ▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*)

27.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* at ZYDUS_MES0023436.)

28.     Following the lubrication stage, the product is compressed into tablets, and then receives both a pH-dependant functional coating, to ensure the active ingredients in the pill pass relatively undissolved through the stomach, and a final film coating. (*Id.* at ZYDUS_MES0023459; Trial Tr. 180:6-181:15 (Little).)

    E.     *Shire's Infringement Theory and the Structure of the ANDA Product*

---

[21] A distintegrant is an excipient which helps a tablet disintegrate. (Trial Tr. 88:1-7 (Kulkarni).)

[22] According to testimony at trial, the term "milling" is synonymous with the term "sizing," and is a process that breaks up particles and filters them through a screen to permit only particles of a specific size to pass through. (Trial Tr. 384:1-10 (Sinko).)

29.    Shire's explanation of its infringement theory correlates the claims of the

'720 patent with the Zydus ANDA product as it moves through different stages of the

production process.  Specifically, Shire asserts that the compaction step creates granules

that include an inner lipophilic matrix created by the lipophilic excipient magnesium

stearate, while the wet granulation step creates the outer hydrophilic matrix through its

use of CMC, SSG, and HPMC, all of which compounds fall within the categories of

compounds listed in the Markush group[23] of Claim 1(b).

30.    Zydus's sole challenge to the assertion that its ANDA product contains an

"outer hydrophilic matrix separate from the inner lipophilic matrix" is based on its

argument that the product does not include an "inner lipophilic matrix."  (Zydus Proposed

Finding of Fact and Conclusions of Law at 107 ¶ 56.)  That being the case, my analysis

focuses on whether Shire has demonstrated the existence of an inner lipophilic matrix.

This task is complicated by Shire's argument on this issue, which sometimes asserts that

the matrix is comprised solely of the three-dimensional arrangement of magnesium

stearate, and other times asserts that the granules produced by the compaction process

(hereafter, the "granules") are themselves the matrix in question.

31.    Whether or not the granules created by the compaction step include or

represent an inner lipophilic matrix within the meaning of the '720 patent depends on

whether the product meets numerous claim limitations from Claim 1(a).  Specifically,

---

[23] "A Markush group is a listing of specified alternatives of a group in a patent
claim." *Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003).
Markush groups are often identified by the phrase "selected from the group consisting
of...," or some variant thereof. *See generally* 3 John Gladstone Mills III et al., *Patent
Law Fundamentals* 14:15.

13

Shire must demonstrate that (1) there is a matrix, *i.e.* a macroscopically homogenous structure in all its volume; (2) that it is lipophilic; and (3) that it is comprised of a compound of the type listed in the Markush group in Claim 1(a), which requires both that the compound be within a certain group of chemicals and have a melting point below 90° C.

    *i.*  *Matrix/Structure of the Granules*

  32. Shire put multiple experts on the witness stand to testify about the physical composition of the granules. The testimony ranged from broad conclusions about the structure based solely on the behavior of the ANDA product, to detailed claims based on advanced microscopy techniques.

  33. The first substantial piece of evidence of the Zydus ANDA product structure presented by Shire was dissolution testing conducted by Vivian A. Gray.[24] Ms. Gray carried out dissolution experiments on three tablets of the Zydus ANDA product. (Trial Tr. at 52:11-18 (Gray).) Her test involved placing sample tablets in three separate dissolution media in sequence to mirror the environments the tablets would encounter during digestion. (*Id.* at 54:20-57:7.) The tablets first spent two hours in the acid stage, where dissolved hydrochloric acid mimicked the pH of a stomach. (*Id.*) The tablets then entered the second stage, a slightly acidic phosphate buffer with a pH of 6.4 for one hour, and finally in the third stage a phosphate buffer with a more neutral pH of 7.2 for eight

---

[24] Ms. Gray is an independent consultant who had a lengthy career with the United States Pharmacopeia, a nonprofit organization for the pharmaceutical industry that sets standards for the industry and produces a book of the same name that is relied upon by the FDA. (Trial Tr. 48:23-49:21; 51:1-13.) She was admitted as an expert for Shire in dissolution testing. (*Id.* at 52:6-9.)

hours, the two stages taken together being meant to mimic successive phases of the

intestinal tract. (*Id.*) At specified timepoints, Ms. Gray would take samples of the media

in which the tablets were dissolving and, using ultraviolet spectrophotometry, assess the

percentage of mesalamine that had dissolved. (*Id.* at 55:18-25.) She testified that from

the tests she was able to determine the dissolution profile of the mesalamine in the Zydus

ANDA product. (*Id.* at 70:7-16; PTX-547-R.) The tablets were also photographed

throughout the process at different time intervals to provide visual evidence of the

dissolution process. (*Id.* at 62:16-63:9; PTX-900.108; PTX-900.184; PTX-900.244;

PTX-900.255; PTX-900.269; PTX-900.281; PTX-900.282; PTX-900.290.)

34.     Dr. Steven R. Little[25] then opined on the data collected from Ms. Gray's

experiment, as well as the dissolution data submitted by Zydus to the FDA. From that

information, Dr. Little concluded that the Zydus ANDA product was a controlled release

formulation, and that its controlled release was the result of "two separate matrices, a

lipophilic and a hydrophilic matrix." (Trial Tr. 170:7-23.) While I credit Dr. Little's

conclusion to a degree, the fact that his conclusions are drawn by inference based on

observing the macro-scale behavior of the ANDA product, I afford only limited weight to

his assertion about the specific structural features of the product.

35.     Shire also presented Dr. Martyn Christopher Davies,[26] who conducted both

optical microscopy and Raman spectroscopy on the Zydus ANDA product. (Trial Tr.

---

[25] *See supra* n. 11.

[26] Dr. Davies is a professor at the University of Nottingham in the U.K and the
founder of a pharmaceutical company, Juniper Pharma. (Trial Tr. 119:10-14.) He was

123:1-124:1 (Davies).)  Optical microscopy is a technique that simply provides a

magnified and illuminated view of the material.  (Trial Tr. 128:4-129:16.)  Raman

spectroscopy is a technique that uses a laser to discern the "chemical fingerprint" of a

particular compound and produces an image showing the distribution of that compound

in the sample.  (*Id.*)  Before both processes, Dr. Davies prepared the samples of the

ANDA product using the microtomy process, which employs a diamond blade to create a

thin slice of the product suitable for imaging.  (*Id.* at 125:7-11.)

36.     Dr. Davies testified that his optical microscopy showed two different

structures, granules and areas around granules, consistent with his expectations based on

his knowledge of the Zydus manufacturing process.  (*Id.* at 132:7-25, 139:25-141:2;

PTX-906; PTX-907 (both marked with alleged granules circled and labeled with a "G").)

37.     He also provided analysis of his Raman microscopy images, at least one of

which was of a cross-section also used for optical microscopy.  (*Id.* at 125:14-17.)  The

images, which Dr. Davies asserted were representative of the entire product, showed

mesalamine distributed throughout the sample.  (*Id.* at 132:2-140:12.)  Importantly, Dr.

Davies testified that mesalamine was present both inside and outside of the granules.

(*Id.*)

38.     Zydus's expert Dr. Joseph A. Gardella[27] refuted Dr. Davies's conclusions

as to what microscopy and Raman experiments actually showed.  Dr. Gardella noted that,

---

accepted as an expert in pharmaceutical science and in the analysis and characterization
of drug formulations. (*Id.* at 122:18-23.)

[27] Dr. Gardella is a professor of chemistry at the University of Buffalo. (DTX-
119.) He was accepted as an expert in quantitative and qualitative analysis of materials,

because Dr. Davies's Raman studies were not quantitative, there was no indication as to

the amount of mesalamine at any particular location and thus no way to know the

concentration at any point.  (Trial Tr. 833:13-18, 845:10-18.)   Dr. Gardella also testified

that, because Dr. Davies did not use Raman mapping for any of the other excipients in the

ANDA product, his results provided no evidence about the location of the mesalamine

vis-a-vis any of the other compounds, including magnesium stearate.  (*Id.* at 844:5-20.)

As a result, he concluded that "no matrices or structures of excipients can be determined

from the Raman data or maps."  (*Id.*)

    39.    Dr. Gardella also challenged Dr. Davies's conclusions from the optical

microscopy.  In particular, Dr. Gardella stated that because optical microscopy provides

no chemical information, he was skeptical that it provided sufficient information to

determine even what constituted granules, particles, or other structures.  (Trial Tr. 849:7-

15 ("[T]he image really provides no additional information that would allow a conclusion

that the Zydus ANDA product has *any* particular structures.") (emphasis added).)

    40.    I am sympathetic to Dr. Gardella's critiques, and share his skepticism of

Dr. Davies's attempt to correlate the microscopy and Raman images.  However, I credit

Dr. Davies's testimony and optical microscopy results to the extent that I find the product

does contain granules.  Furthermore, based on the Raman images and the testimony about

them, coupled with the undisputed fact that mesalamine makes up an overwhelming

percentage of the mass of the ANDA product, I find that there is mesalamine both inside

---

including pharmaceuticals, using a variety of techniques including Raman spectroscopy.
(Trial Tr. 832:14-21.)

and outside those granules. But, I agree with Dr. Gardella that Dr. Davies's experiments do not provide any evidence about the location or structural organization of any excipient either inside or outside of the granules, including magnesium stearate.

      *ii.*    *Lipophilicity*

    41.    Shire's evidence that the ANDA product's alleged inner matrix is lipophilic came from two principal sources – a drop penetration experiment and the literature regarding the lipophilicity of magnesium stearate.

    42.    I begin with Dr. Stephen W. Hoag's drop penetration experiment, which was the source of considerable dispute both at the trial and in the post-trial briefing.[28] Shire called Dr. Hoag as a witness to explain "whether the addition of magnesium stearate and [CSD] to mesalamine results in some resistance to the penetration of water due to the poor affinity towards aqueous fluid." (Trial Tr. 224:15-20 (Hoag).) To make that determination, Dr. Hoag used a drop penetration test wherein he compared the absorption of pure mesalamine to one of mesalamine blended with CSD and magnesium stearate in the same ratios as those found in the Zydus product.

    43.    Dr. Hoag testified that a drop penetration test may be conducted using either a bed of powder or a compact of the substances, and that he opted to use a compact in order to reduce the number of variables between his control and test samples. (*Id.* at 231:21-232:18.) Dr. Hoag began his test by creating twelve compacts (alternatively

---

[28] Dr. Hoag is a professor at the University of Maryland School of Pharmacy. (Trial Tr. 224:24-25.) He was accepted as an expert in the field of pharmaceutical formulation and process design and testing. (Trial Tr. at 230:14-19.)

referred to as "tablets"). Six contained only mesalamine, and the other six contained 99.3% mesalamine, 0.33% magnesium stearate, and and 0.41% CSD.[29] (*Id.* at 233:21-234:8.; PTX-577.2.) The tablets were created by sieving and blending the ingredients, then dry granulating them using a roll-compactor. The product of the roll-compaction was then milled and compacted into tablet form. (Trial Tr. 234:9-235:4.)

44.    Once the test tablets were created, Dr. Hoag mounted a capillary tube above the surface of each tablet, marked the tube to note a specified amount of water,[30] filled it to that mark with water, then raised the tablet up to the capillary tube. At that point, the tablet began absorbing the water. Dr. Hoag took photographs and video of that process, then collected the data to assess the difference in absorption rate between the pure mesalamine tablets and the blended mesalamine tablets. (Trial Tr. 236:16-240:16.) He testified that pure mesalamine absorbed the full quantity of water in the capillary in 48.5 seconds on average, whereas the blended mesalamine tablets took 123.5 seconds on average to absorb all the water. (Trial Tr. 239:9-240:2; PTX-577.6.) From that, Dr. Hoag concluded that the addition of magnesium stearate and CSD to mesalamine resulted in greater resistance to the penetration of water, and credited the magnesium stearate for that effect. (Trial Tr. 239:9-240:21.)

---

[29] For reasons not given at trial, only three samples of each were tested. (PTX-577.6.)

[30] See *infra* note 32 and accompanying text.

45.    Zydus disputes Dr. Hoag's findings, challenging not only his conclusions but the underlying methodology as well. Its witness, Dr. Robert Bellantone,[31] took issue with a number of features of Dr. Hoag's test. First, Dr. Bellantone asserted that the capillary test performed by Dr. Hoag was not a drop penetration test at all, as the only article he cited in support of his methodology used a much smaller amount of water, only 6 to 11 μL, as opposed to the approximately 57 μL[32] that Dr. Hoag used. (Trial Tr. 241:19-21, 250:10-251:2 (Hoag); Trial Tr. 569:24-571:14 (Bellantone).) The most important complaints, however, stem from Dr. Hoag's compression of the blended and unblended mesalamine into tablets. Dr. Bellantone asserted that, as a result of the compression, the resultant tablets contained visible surface imperfections, likely had internal imperfections, and varied in the size and shape of the pores within the tablets, all differences that the experiment did not control for. All of these factors, he claimed, could influence the rate of water uptake.[33] (Trial Tr. 572:9-573:12, 574:17-21, 576:7-15,

---

[31] Dr. Bellantone is a former professor at Long Island University. (DTX-106.) He was accepted as an expert in the field of pharmaceutical and material sciences, including surface and interface chemistry. (Trial Tr. 551:7-13.)

[32] This number was calculated by Dr. Bellantone based on the relative size of the tube to the tablet, in conjunction with his knowledge of the sizes of commercially available capillary tubes. (Trial Tr. 569:24- 570:17.) Dr. Hoag did not record the size of the capillary or the amount of water used. (*Id.*; PTX-577.6.) As the volume calculated by Dr. Bellantone was undisputed by Dr. Hoag or anyone else, I adopt it.

[33] Dr. Bellantone also lamented that Dr. Hoag's test used mesalamine and magnesium stearate provided by companies other than those used by Zydus in its ANDA product, that it used a different grade of silicon dioxide, that the bulk density of the granules made by Dr. Hoag was insufficient, and that the tablets' properties were different because they had not been through the wet granulation stage. (Trial Tr. 552:1-22, 557:9-559:4, 567:15-568:2.) All of these problems relate to the applicability of Dr.

617:20-618:14.) Dr. Bellantone concluded, persuasively, that the litany of problems resulted in a test with too many variables, thus invalidating Dr. Hoag's conclusions regarding the influence of magnesium stearate, even in the limited form he presented at trial. (Trial Tr. 578:6-22.)

46.     I acknowledge the multiple infirmities raised by Zydus regarding Dr. Hoag's drop penetration test as conducted, but I do credit it to a limited extent. I find that his test and testimony demonstrated that the addition of magnesium stearate and CSD to mesalamine results in some resistance to the penetration of water. It did not, however, prove whether the granules in the Zydus product at issue have a "poor affinity towards aqueous fluid." Although his expert report asserts that his experimental tablets "simulate[d] the inner volume of the granules of the Zydus ANDA product," Dr. Hoag disavowed that point at trial. (Trial Tr. 244:14-247:9.) Instead, he stated that his opinion was limited to the specific findings of his experiment, and that he was not "offering an opinion ... about the alleged lipophilicity of what is called the granules in the Zydus ANDA product." (Trial Tr. 247:6-9.)

47.     Dr. Hoag provided no evidence that the mesalamine blend compact exhibited a rate of absorption that indicated a below average affinity for aqueous fluid, or

---

Hoag's conclusions about his tablets to the Zydus ANDA product.  Because, as mentioned, Dr. Hoag has disavowed his position that his test is representative of a test on the ANDA product, those particular complaints by Zydus are of significantly less weight, as the point has already been effectively conceded by Shire.

even a lower affinity than the outer hydrophilic matrix.[34] Indeed, nothing in his

testimony demonstrated to me that the Zydus granules would be properly categorized as

objectively lipophilic.[35] I am more inclined to credit Dr. Bellantone's assertion that, on

the whole, both the pure mesalamine and mesalamine blend tablets exhibited properties

that could be called hydrophilic, not lipophilic, given that the tablet containing

magnesium stearate took up a "large amount of water" in only 111 to 139 seconds. (Trial

Tr. 581:20-24.)

48.    Taking into account the evidence presented by both parties, I find that

magnesium stearate is lipophilic and exhibits poor affinity towards aqueous solutions, but

that Shire has not proven that the granules produced by the first stage of the Zydus

ANDA process are lipophilic, exhibiting poor affinity towards aqueous solutions.

###### iii.    *Claim 1(a) Markush Group and Melting Point*

49.    Shire also asserts that magnesium stearate is a member of the Claim 1(a)

Markush group, which limits the types of materials that can be used to form the inner

lipophilic matrix. The Markush group requires that the inner lipophilic matrix consists of

"unsaturated and/or hydrogenated fatty acid, salts, esters or amides thereof, fatty acid

mono-, di- or triglycerids, waxes, ceramides, and cholesterol derivatives with melting

---

[34] As Zydus points out, Shire commissioned that precise experiment in *Shire Development LLC v. Watson Pharmaceuticals, Inc.*, No 12-60862 (S.D. Fla.) (filed May 8, 2012).

[35] Shire did present compelling evidence, both in the form of testimony and citation to the literature, that magnesium stearate is a lipophilic substance that can retard drug dissolution. (*See supra* Finding of Fact ("FF") ¶ 19.) That, however, is a different issue than the lipophilicity of the granules in the Zydus ANDA product.

points below 90° C," ('720 Patent, Col. VI, 10-17), thus creating two limitations – one which restricts the type of compound used to the listed groups, and one which limits the melting point of that compound.

50.    As to the first, I agree with Shire that magnesium stearate is a salt of a hydrogenated fatty acid and therefore is within one of the categories of substances in the Claim 1(a) Markush group, based on the evidence noted above. (*See supra* Finding of Fact ("FF") ¶ 18.)

51.    As to the second limitation, both parties put on numerous, conflicting witnesses as to the melting point of magnesium stearate, and specifically whether it is below 90° C, as required by Claim 1(a). The melting point of a substance is the temperature at which solid and liquid phases of a compound are at equilibrium.[36] (Statement of Uncontroverted Facts, D.I. 407 Ex. 1 at ¶13(c).)

52.    Shire's expert Dr. Hanton conducted a Differential Scanning Calorimetry ("DSC") study on the commercial magnesium stearate used by Zydus.[37] (Trial Tr. 261:3-263:4 .) DSC is the standard method used in the pharmaceutical field for determining a

---

[36] This definition is the product of my claim construction and must also be considered a conclusion of law, *Liberty Ammunition, Inc. v. United States*, No. 2015-5057, 2016 WL 4488151, at *4 (Fed. Cir. Aug. 26, 2016) ("[t]he ultimate interpretation of a claim term … [is a] legal conclusion[]"), and so appears again in the next section under that heading.

[37] Dr. Hanton also conducted other instrumental analyses including Fourier-transformation infrared analysis, thermogravimetric analysis, and gas chromatography that confirmed that the magnesium stearate used by Zydus is, in fact, magnesium stearate, and that it is in a hydrated form. (Trial Tr. 254:15-255:11 (Hanton).)  Because those facts are undisputed, I will not address them further. *See also, supra.* n 10.

23

melting point.  (Trial Tr. 299:22-24 (Pinal[38]).)  The technique involves the gradual

heating of a small amount of a compound, during which time the device measures how

heat is absorbed and given off by the compound.  Heat absorption signals an endothermic

reaction and is represented by an "endotherm," which is represented in the DSC results as

a downward facing "peak," as can be seen in the figure below.[39]  Heat expulsion, in

contrast, signals an exothermic reaction and is represented by an "exotherm," an upward

facing peak in the DSC results.  Both endotherms and exotherms signal a change in the

chemistry or composition of the compound being tested.  (Trial Tr. 263:13-25 (Hanton).)

The graphical results of that experiment are reproduced below:

---

[38] Dr. Rodolfo Pinal is an associate professor at Purdue University.  (PTX-637.)
He testified on behalf of Shire and was accepted as an expert in pharmaceutical science
and melting point analysis.  (Trial Tr. 285:20-25.)

[39] It is odd, I know, to call a graphical valley or crevasse a "peak," but that is the
shorthand used by both the experts before me and by the cited literature, and so I adopt
the same language.



(PTX-553.)

53.     Dr. Hanton's DSC experiment produced two endotherms – a broad peak
that begins to deepen sharply around 80° C, and a second, still sharper peak that begins
just before the sample reaches 120° C. (PTX-553). The critical temperature in
measuring the endotherm is the "onset" temperature, which is measured as the
intersection between the baseline and the steepest point of the endortherm's or
exotherm's slope extended.[40]  (Trial Tr. 262:17-22) (Hanton).)  Dr. Hanton's experiment
yielded an onset temperature of 82.85° C for the first endotherm and of 126.17° C for the
second.  (PTX-553).  He also testified that the onset point was the temperature where the
solid and liquid phases are at equilibrium, *i.e.* the melting point.  (Trial Tr. 289:4-11.)

---

[40] This intersection can be seen clearly in PTX-553, *supra* ¶ 52, and DTX-102,
*infra* ¶ 60.

25

54.     Shire called Dr. Rodolfo Pinal[41] to provide an analysis of Dr. Hanton's results.  Dr. Pinal testified that the two endotherms each represent a physical transformation of the test compound.  With respect to the first endotherm, which stretches across the critical threshold of our inquiry, 90° C, Dr. Pinal testified that the endotherm included three changes of state in the magnesium stearate – a dehydration, a melt, and a subsequent recrystallization into an anhydrous state.  (Trial Tr. 301:7-305:10.)  All three of those events, he said, were represented by the single endotherm.  The first two changes, the dehydration and melt, are both endothermic processes.  The third, the recrystallization, is an exothermic process.  While an exothermic process should, in theory, manifest as a peak in the opposite direction of the endotherm (up, rather than down), Dr. Pinal asserted that because the DSC provides only the "net balance of energy" transferred, the exothermic peak was actually "buried" by the "larger contributions" of the two endothermic reactions.  (Trial Tr. 306:1-308:6.)  That, of course, is not something that can be seen on the graph.

55.     Dr. Pinal also testified that the second endotherm, appearing with an onset point at 120° C, represented the melt of very pure anhydrous magnesium stearate.  He further opined that the sharpness of that peak was evidence of a well-ordered crystal of the type that would be produced by the recrystallization of a liquid.  (Trial Tr. 301:7-305:10.)  In other words, it was his contention that the sharp peak seen in Dr. Hanton's DSC could only have emerged if the hydrated magnesium stearate had *melted* during the first endotherm, then rapidly recrystallized.

---

[41] See *supra* n. 38.

56.     In further support of the contention that the first endotherm signified a melt,

Dr. Pinal said that the literature on magnesium stearate recognized that the compound

loses anisotropy during its dehydration.  (Trial Tr. 308:20-313:16.)  Anisotropy is a

property of some crystals such that polarized light will pass through them and be visible

at certain angles but not others.  (Trial Tr. 309:6-310:9 (Pinal), 665:5-23

(Hollingsworth).)  Dr. Pinal testified that, while some crystals possess anisotropic

properties, liquids do not.  Because the prior literature reported a loss of anisotropy

coincident with the dehydration that occurs under the first endotherm, Dr. Pinal

concluded that liquid must form during that transition.  (Trial Tr. 312:1-313:16.)

57.     Taking into consideration both the DSC and the loss of anisotropy, Dr.

Pinal concluded that magnesium stearate melts below 90° C.  (*Id.* at 318:10-18.)

58.     Zydus also called a series of experts to testify as to the melting point of

magnesium stearate.  The first Zydus melting point expert, Dr. Mark J. Sacchetti,[42]

testified regarding the hot-stage microscopy experiment he conducted on the Zydus

ANDA magnesium stearate.  In hot-stage microscopy, a small quantity of the substance

to be analyzed is placed under a microscope, then slowly heated while a video camera

records any physical changes in the substance.  (Trial Tr. 627:17-628:2 (Sacchetti).)  Dr.

Sacchetti concluded that the experiment showed no change in magnesium stearate

particles between 80° C and 93° C, and that the particles only began to show the signs of

---

[42] Dr. Sacchetti is the Scientific Director of the Lenor Zeeh Pharmaceutical
Experiment Station in the School of Pharmacy at the University of Wisconsin-Madison.
(DTX-101.)  He was accepted as an expert in solid state chemistry and solid state
chemical testing.  (Trial Tr. 624:19-625:2.)

an impending melt as the temperature approached 130° C.  (Trial Tr. 628:10- 629:4.)  Of

note, the video of at least one iteration of the experiment suffered a loss of focus between

85 and 86° C.  (Trial Tr. 644:3- 645:7 (Sacchetti).)  Shire characterizes this as "likely

visual evidence of a melt below 90° C."  (Shire's Proposed Findings of Fact and

Conclusions of Law ¶ 276.)  Dr. Sacchetti, in contrast, averred that the camera simply

lost focus, which is a common occurrence in this type of experiment.  (Trial Tr. 644:3-

645:7 (Sacchetti).)  I find Dr. Sacchetti's explanation more plausible and credit his

testimony accordingly.

    59.    Another Zydus expert, Dr. Mark D. Hollingsworth[43] also presented his

opinion on Dr. Sacchetti's hot stage microscopy results.  (Trial Tr. 680:6-683:15.)  First,

Dr. Hollingsworth agreed with Dr. Sacchetti that the video of the experiment showed "no

apparent changes" in the substance between 70 and 90° C, and that the sample did not

show any real sign of change until around 130° C.  (Trial Tr. 680:6-21; DTX105.)  He

went on to discuss another hot stage microscopy experiment on magnesium stearate from

the literature.  The images from that paper, Dr. Hollingsworth asserted, show that there is

no meaningful change in the crystalline magnesium stearate between 88° C and 96° C.

(Trial Tr. 681:13-683:12.)  Moreover, the authors of the paper claimed that the crystal

structure still appeared anisotropic at 96° C, a fact that Dr. Hollingsworth said was

consistent with his conclusion that magnesium stearate undergoes a solid-solid

dehydration.  (*Id.*)  He also presented persuasive evidence that solid-liquid-solid

---

[43] See *supra* n 8.

recrystallizations tend to produce much more visible variation in the size and shape of crystals before and after the liquid stage.  (*Id.* at 725:17-723:19; DTX 99B.)

60.    Dr. Sacchetti also performed a DSC experiment, wherein he raised the temperature at a slower rate than did Dr. Hanton, increasing at only 5° C per minute rather than 10° C per minute.[44]  (Trial Tr. 625:23-626:3 (Sacchetti); 742:24-743:11 (Hollingsworth).)  The results of that experiment are reproduced below:



(DTX-102 at 2.)

---

[44] The rate of increase is meaningful because, according to Dr. Hollingsworth, a slower increase produces a more detailed graph that provides better information about what is happening to the compound.  (Trial Tr. 691:20-692:5.)

61.     The graphical result of that experiment closely resembles the graph produced by Dr. Hanton's DSC experiment.  (*Compare* DTX-102 *with* PTX-553.)  Like Dr. Hanton's results, Dr. Sacchetti's results include a broad peak that spans the 90° C threshold and sharp peak around 125° C.  (DTX-102 at 2.)  Dr. Sacchetti calculated onset temperatures for the first peak at 73.89° C and for the second at 125.56° C.  (*Id.*)

62.     Dr. Hollingsworth provided additional testimony interpreting Dr. Sacchetti's DSC results.  He confirmed that Dr. Hanton's and Dr. Sacchetti's results were consistent with one another, and that they were consistent with previously published DSC results for magnesium stearate.  (Trial Tr. 690:6-691:16; PTX-504A.)  He also presented DSC results for two unrelated substances as a reference for better understanding the DSC results created by Drs. Hanton and Sacchetti.

63.     In the first, Dr. Hollingsworth showed a graph depicting the DSC analysis of two compounds that presented very similar profiles[45] to the ones created by the experiments undertaken in this case – a broad peak occurring at a relatively low temperature followed by a sharp, narrow endotherm at a higher temperature, as follows:

---

[45] I note that the peaks in that reference, as well as the reference that follows, face in the opposite direction (*i.e.* endotherms pointed upward and exotherms downward); apparently there is not a standard for graphical representation of endothermic versus exothermic reactions.



Fig. 12 DSC scans of the hydrates of two different ergot alkaloids with different dehydration temperatures.

(Trial Tr. 686:6-16; PTX-496-A.[46])

64.     Dr. Hollingsworth then noted with approval the reference's annotation of

the graph which describes the first, broad peak as a dehydration and the second, narrow

peak as a melt of the anhydrous compound. (Trial Tr. 686:6-16.) The process shown in

the reference, according to Dr. Hollingsworth, was categorized as a "type one process, in

which the dehydration occurs in a solid-solid phase transition without melting." (*Id.*) Dr.

Hollingsworth also took the opportunity during this discussion to dispute Dr. Pinal's

testimony that the narrowness of the second peak was related to crystallographic purity.

He asserted, instead, that the factors affecting the peaks were much more complex,

including "lots of different cooperative interactions" and the "chemical purity of the

sample." (Trial Tr. 687:2-11.)

---

[46] This exhibit and PTX-496-B, found at *infra* ¶ 65, are sourced from D. Giron,
*Thermal analysis and calorimetric methods in the characterisation of polymorphs and
solvates*, 248 Thermochimica Acta 1, 23 (1995).

65.     Dr. Hollingsworth went on to present a second graph from the same

literature reference that was notably different from the DSC results seen in this case.

That graph, which demonstrated what the author had classified as a "type two

dehydration process" (Trial Tr. 687:19-20), is reproduced below:



Fig. 13. DSC and TG scans of a substance in which dehydration occurs just after melting and the anhydrous form crystallises from the melt.

(PTX-496-B.)

66.     The graph from the literature includes the same broad dehydration

endotherm and sharp, narrow endotherm representing the melt of the anhydrous form, but

also contained a relatively sharp exothermic peak immediately after the dehydration

endotherm (PTX-496-B).  Dr. Hollingsworth testified that that sort of graph, and not the

ones produced by Drs. Hanton and Sacchetti, is what a DSC result looks like when a

compound dehydrates, melts, and recrystallizes, as evidenced by the exotherm produced

32

by the recrystallization from a liquid.  (Trial Tr. 687:18-688:11.)  Based on his evaluation

of the DSC results produced by the experiments of Drs. Hanton and Sacchetti,

independently and in comparison to the DSC graphs found in the literature, Dr.

Hollingsworth concluded that there is "absolutely no evidence," in either DSC, "for a

recrystallization exotherm."  (Trial Tr. 690:6-21.)  He further opined that the DSC results

produced by Drs. Hanton and Sacchetti are reflective of those in the literature.  (Trial Tr.

690:22-692:5.)  He also noted that the matching DSC results from the literature were

produced using a slower heating rate, just 2° C per minute, which made it more likely

that the results would have parsed out overlapping events, such as a recrystallization

exotherm that occurred shortly after a dehyrdration endotherm.  (Trial Tr. 691:20-692:5.)

67.     Dr. Hollingsworth also responded to Dr. Pinal's testimony regarding

anisotropy, testifying that the structural changes to the magnesium stearate involved only

a dehydration, then a solid-solid phase transition that produced the final anhydrous

crystal.  (Trial Tr. 667:6-14.)  This process, as Dr. Hollingsworth describes it, involves a

transition from a high-symmetry crystal (presumably the hydrated form of magnesium

stearate) to a low-symmetry crystal and finally back into a high symmetry crystal, now of

the anhydrous form, all of which occurs without the compound ever melting.  (Id.)

68.     Dr. Hollingsworth provided additional detail about solid-solid phase

transitions, which he proposed to be the mechanism by which the magnesium stearate

was dehydrating without undergoing a melt.[47]  Based on his review of the literature, he

---

[47] Dr. Hollingsworth also spoke at length about the literature stemming from the
use of X-ray crystallograpy to assess the crystal structure of magnesium stearate, and

opined that the heated hydrated magnesium stearate crystal is converted into an

anhydrous mesophase, which would likely appear isotropic (*i.e.* without anisotropy)

when viewed with polarized light. (*Id.* at 723:24-727:10.) He posits that that, not a melt,

is the source of the loss of anisotropy around 90° C.

69.     Finally, Zydus's expert Dr. Thomas V. O'Halloran[48] conducted a capillary

melting point determination, a test recommended by the United States Pharmacopeia[49] for

assessing melting point. (Trial Tr. 903:14-21 (Banakar).)  The test, however, included a

step in which the sample tested was placed in a desiccator for 16 hours prior to the

initiation of the analytically meaningful steps of the experiment. (Trial Tr. 812:22-

814:7.) I inquired during trial whether this meant that the sample ultimately being

analyzed was anhydrous, and Dr. O'Halloran responded that, absent further testing

(which he did not conduct), it was not possible to be certain what state of hydration the

magnesium stearate was in following the dessication. (Trial Tr. 814:14-816:10.) As

discussed at length above, whether or not the magnesium stearate is hydrated is an

important consideration in the melting point inquiry.  Without the ability to confirm

whether the substance tested by Dr. O'Halloran was the hydrated form of magnesium

---

literature providing other schematic representations of crystal structures and the
transitions between crystal types.  While interesting, those references are not necessary to
my conclusion and I have thus opted not to explore them further.

[48] Dr. O'Halloran is a professor of chemistry and molecular bioscience at
Northwestern University and the Senior Advisor to the Director of the Robert H. Lurie
Comprehensive Cancer Center. (DTX 55.) He was accepted as an expert in the analysis
of metal organic compounds, including the determination of melting points through the
use of a capillary method. (Trial Tr. 808:4-10.)

[49] See *supra* note 24.

stearate present in the Zydus ANDA product, the results of his experiments are irrelevant to the question at hand, and so I disregard them.

70.     In addition to the analyses proffered by each side, both Shire and Zydus presented credible, conflicting evidence from the scientific literature. Dr. Pinal testified to numerous scientific handbooks and dictionaries published between 1986 and 2003 that listed the melting point of magnesium stearate at either 88.5° C or 89° C. (Trial Tr. 318:19-321:24.). Zydus presented conflicting evidence, in the form of testimony from Shire's original melting point expert, Dr. Allen, who testified that one of the handbooks on which Dr. Pinal relied has actually been updated to reflect a melting range of 117-150° C for commercial magnesium stearate and 126-130° C for the highly purified compound. (Trial Tr. 889:14-891:25.)

71.     Taking into account all of the evidence presented by both sides on this issue, and bearing in mind Shire's burden of proof, I find the evidence to be, if not in Zydus's favor, at least in equipoise, and therefore cannot find that the magnesium stearate used in the Zydus ANDA product has a melting point below 90° C.

## III.     CONCLUSIONS OF LAW

1.     Jurisdiction over the subject matter of this action is proper under 28 U.S.C. §§ 1331 and 1338.

### A.     Literal Infringement

2.     A party commits patent infringement when it "makes, uses, offers to sell, or sells any patented invention ... ." 35 U.S.C. § 271(a). Under the Drug-Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-

35

Waxman Act, Pub.L. No. 98–417, 98 Stat. 1585 (codified as amended at 21 U.S.C. § 355;

35 U.S.C. §§ 156, 271, 282), submitting an ANDA for a drug claimed in a patent

constitutes an act of infringement.  35 U.S.C § 271(e)(2)(A).

3.     Determining whether a patent has been infringed is a two-step process.  The

first step is determining the meaning and scope of the patent through the process of claim

construction, and the second step is comparing the accused product to the properly-

construed claims.  *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129

(Fed. Cir. 2011).

4.     Beginning with claim construction, the parties agreed to the meaning of

several claim terms, stipulating that:

- a "matrix" is a "macroscopically homogenous structure in all its volume";

- a substance that is "hydrophilic" "has an affinity for water"; and

- a substance that is "lipophilic" has a "poor affinity towards aqueous fluids."

(Joint Claim Construction Statement, D.I. 346.)

5.     I construed other claim terms, concluding as follows:

- an "inner lipophilic matrix" is "a matrix that exhibits lipophilic properties

  and is separate from the outer hydrophilic matrix";[50]

---

[50] My construction of some terms was based on the Federal Circuit's construction
of those terms from the '720 patent in *Shire Development, LLC v. Watson
Pharmaceuticals, Inc.*, 787 F.3d 1359, 1365 (Fed. Cir. 2015).  Because claim
construction represents a legal conclusion, it is subject to deference under the principle of
*stare decisis*.  *Cf. Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*, 515 F.3d
1331, 1338 n.* (Fed. Cir. 2008) (noting that, for the Federal Circuit to "not to adopt the
same claim construction in a case such as this, in which the construction of the claim
term in question was a necessary predicate to the determination of a prior litigation before

- an "outer hydrophilic matrix" is "a matrix that exhibits hydrophilic properties and is separate from the inner lipophilic matrix";

- a "melting point" is "the temperature at which solid and liquid phases of a compound are at equilibrium";

- two substances are "dispersed" if they are "sufficiently mixed to incorporate one substance into another;"

- "optionally other excipients" means "excipients, not including coatings, other than those substances forming the inner lipophilic matrix and those substances forming the outer hydrophilic matrix."

*Shire Dev. Inc. v. Cadila Healthcare Ltd.*, No. CV 10-581 (KAJ), 2015 WL 4596410 (D. Del. July 28, 2015).

6.      As to the second step of the analysis, Shire bears the burden of proving by a preponderance of the evidence that the allegedly infringing product meets every limitation of the construed claims. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1253 (Fed. Cir. 2010).  In cases like this, where the technical act of infringement is the filing of an ANDA, the operative question is "whether, if the drug were approved based upon the ANDA, the manufacture, use, or sale of that drug would infringe the patent in the conventional sense." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).  "[T]his hypothetical inquiry is properly grounded in the

---

this court and is evident from the face of the intrinsic record without resort to expert testimony, would run counter to the Supreme Court's guidance on stare decisis in *Markman* ... .").

ANDA application and the extensive materials typically submitted in its support," as well as any other pertinent evidence. *Id.*

7.      I conclude that Zydus's tablets will not literally infringe Claim 1 or Claim 3 of the '720 patent. Because Claim 3 depends from Claim 1, I focus my analysis on the latter.

8.      Claim 1 of the '720 patent contains three limitations that form the heart of this dispute, all of which pertain to the inner lipophilic matrix.[51]  Specifically, the parties dispute the existence of a "matrix," whether any such matrix is lipophilic, and whether magnesium stearate falls within Claim 1(a)'s Markush group.  Plaintffs' failure to adequately prove that the ANDA product meets these limitations constitutes three independent grounds for a finding of non-infringement.  I address each in turn.

      *i.*      *"Matrix" Limitation*

9.      In searching for an inner lipophilic matrix within the Zydus ANDA product, the existence of a matrix – a "macroscopically[52] homogenous structure in all its

---

[51] Zydus's argument that its product does not meet the "outer hydrophilic matrix" limitation is predicated entirely on the notion that there is no inner lipophilic matrix, and thus there is nothing for another matrix to be "outer" to or separate from. (*See* Zydus's Proposed Findings of Fact and Conclusions of Law ¶ 121.)  Thus, the entirety of this dispute rests on the disagreements about the inner lipophilic matrix.

[52] While not essential to the disposition of this case, I note that both parties' statements regarding the meaning of "macroscopic," specifically during the testimony of Shire's expert Dr. Sinko and Zydus's expert Dr. Hollingsworth, provided fine examples of Humpty Dumpty's theory of language – that when someone uses a word, "it means just what [he] choose[s] it to mean – neither more nor less." Lewis Carroll, *Through the Looking Glass* 123 (1897).  After Dr. Sinko testified that something macroscopic must be "large enough to be observed by the naked eye," (Trial Tr. 467:8-9), he indicated that, even if one "need[s] a microscope or magnifying glass to view something" one is

volume" – is a prerequisite to determining any characteristics of that matrix.  Shire, for

the most part, asserts that the matrix is comprised of magnesium stearate inside the

granules created by compaction.  (*See, e.g.*, Shire's Proposed Responsive Findings of

Fact and Conclusions of Law ¶ 59, Shire's Proposed Findings of Fact and Conclusions of

Law ¶ 209.)  The argument that magnesium stearate, which is more or less strewn

throughout the mesalamine that makes up over 99% of the granules' volume, constitutes

a structure is a strain from the start.  In service of its position, Shire argues that the word

"structure" means simply "the arrangement of particles or parts in a substance or body."

(Shire's Proposed Findings of Fact and Conclusions of Law ¶ 201 (citing to Merriam

Webster's Collegiate Dictionary 573 (10th ed. 1997)).)  Dr. Patrick J. Sinko,[53] Shire's

infringement expert, adopted and expounded on that position during his testimony,

asserting that the "three-dimensional dispersion" of the mesalamine throughout the

granule constituted the matrix.  (Trial Tr. 449:1-451:25.)   He persisted in that position,

despite the fact that the magnesium stearate particles are "held in place by mesalamine

that is in the granule" and that, taking the mesalamine away, all that would remain is

"magnesium stearate in a pile."  (*Id.*)

10.    Zydus argues, persuasively, to the contrary – that the "matrix must be more

than the disconnected particles of a single excipient in a granule."  (Zydus's Proposed

---

nonetheless "viewing it with [the] naked eye" (*Id.* at 467:10-17).  Dr. Hollingsworth
similarly classified as "probably fair" the notion that "pictures from a microscope …
show[] macroscopic shape."  (Trial Tr. at 753:12-16.)  The notion that something that
must be viewed with a *microscope* is somehow *macro*scopic is, at least for me, tough to
get a handle on.

[53] See *supra* n. 12.

Responsive Findings of Fact and Conclusions of Law ¶ 31.)  It contends that Shire's

understanding of "matrix" is inconsistent with industry usage of that term, and cites

several references provided in the '720 patent application that are implicitly, if not

explicitly, at odds with Shire's current take on the term.  (*See, e.g.*, DTX-2 at

PLMESA3534285 (discussing the potential that a matrix system could "crack[],"

affecting the drug distribution), PLMESA03534284 (showing the "ghost" polymer that

may remain after a drug has dissipated from within a polymer matrix system); DTX-31A

(same); DTX-13-1 at 4 (providing another example of active ingredient dispersed in a

surrounding matrix).)  Zydus also notes that Shire presented no evidence that this newly

propounded "three-dimensional dispersion" definition, sourced from a non-technical

dictionary, is the interpretation of structure that one having ordinary skill in the art would

have used.

11.    The testimony of Dr. Sinko notwithstanding, I conclude that a collection of

unconnected molecules distributed throughout another substance does not a matrix make.

Indeed, based on the evidence presented, I credit the conclusion of Zydus's infringement

expert, Dr. Umesh Banakar,[54] that, in the context of the '720 patent, the term "structure"

means something more than the arrangement of disconnected particles dispersed

throughout a granule.[55]  (Trial Tr. 976:12-980:16.)

---

[54] See *supra* n. 7.

[55] What that is, precisely, I need not and do not decide, as Shire's failure to prove
that the Zydus ANDA product exhibits any such structure is dispositive.

12.    Consequently, to the extent that Shire posits an inner lipophilic matrix formed by magnesium stearate, I conclude that the Zydus ANDA product does not meet the limitation of including an "inner lipophilic matrix," because the source of its alleged lipophilicity lacks structure, and thus is not a matrix at all.

13.    Shire contends in the alternative that the granules themselves may form the claimed structure, and that those granules exhibit lipophilic properties as a result of the magnesium stearate present in them.  (Shire's Proposed Responsive Findings of Fact and Conclusions of Law ¶ 46; cf. Shire's Proposed Findings of Fact and Conclusions of Law ¶ 206 (asserting the granules to be a structure within the meaning of the patent).)  While argument in the alternative is neither discouraged nor unusual, in this instance it is actually symptomatic of a problem that arose throughout the presentation of Shire's case at trial and in the post-trial briefing – namely, a lack of focus on precisely what constitutes the inner lipophilic matrix that Shire says is in the Zydus ANDA product.  As just noted, sometimes it was said that the magnesium stearate scattered within the granule was what formed the "structure" of the matrix, and other times it was supposedly the granule itself that was the structure.  That oscillation between theories was perhaps understandable since Shire was struggling to demonstrate the elements of infringement – namely a "macroscopically homogenous structure in all its volume" "that exhibits lipophilic properties and is separate from the outer hydrophilic matrix."  For the reasons detailed above, the magnesium stearate cannot form the inner lipophilic matrix because it is dispersed and entirely without structure.  Seemingly in anticipation of that conclusion, Shire tried to pivot and suggest that I could rely on the granule to supply the structure

41

necessary to find a matrix. That is unpersuasive, but, even if it were, there would be no infringement because of the "lipophilic" limitation.

ii.     *"Lipophilic" Limitation*

14.     Assuming *arguendo* that the granules are the "structure" of an inner lipophilic matrix, Shire had to show that they are lipophilic.[56] Shire argues that the granules must be lipophilic because they include magnesium stearate, which imparts lipophilic properties into the granules by virtue of its own lipophilicity. That description, while true, is inapposite. As noted by the Federal Circuit in *Shire Development, LLC v. Watson Pharmaceuticals, Inc.,* "the *matrix* – not just an excipient within the matrix – must exhibit the stipulated-to lipophilic characteristic." 787 F.3d 1359, 1365 (Fed. Cir. 2015). In other words, if the granule supplies the structure, then the granule is the matrix, and must itself be lipophilic in order to meet the claims' limitations. However, as previously discussed, Shire failed to present persuasive evidence that the granules exhibit a "poor affinity towards aqueous solutions." (FF ¶ 48.) On the contrary, the granules themselves were hydrophilic in nature. (FF ¶ 47.) Consequently, even if the Zydus ANDA product contains an inner matrix in the form of the granules, that matrix is not lipophilic, and the ANDA product does not meet the limitations of Claim 1(a). The Zydus ANDA product thus does not literally infringe the '720 patent under that theory, either.

iii.     *Markush Group Limitation*

---

[56] As noted above, the granules do constitute a structure, (FF ¶ 40), but for the reasons that follow, they are nonetheless not an inner lipophilic matrix.

42

15.     If Shire had demonstrated that magnesium stearate formed an inner lipophilic[57] matrix, it would then need to demonstrate that magnesium stearate falls within the Markush group that limits the composition of that matrix.  Claim 1(a) of the '720 patent contains a Markush group that limits the makeup of the inner lipohilic matrix to "substances selected from the group consisting of unsaturated and/or hydrogenated fatty acid, salts, esters or amides thereof, fatty acid mono-, di- or triglycerids, waxes, ceramides, and cholesterol derivatives with melting points below 90° C."  As earlier noted, that creates two limitations, requiring that the matrix be a compound that (1) falls within one of the listed classes and (2) melts below 90° C.

16.     I have found as a matter of fact that magnesium stearate is a salt of a fatty acid; it thus falls within the class limitation of the Markush group.  (FF ¶ 18.)  However, because I have also found that Shire did not prove that magnesium stearate melts below 90° C (FF ¶ 71), I conclude that Shire likewise failed to prove that the compound qualifies as part of the Markush group.  Consequently, even if the magnesium stearate in the Zydus ANDA product forms an inner lipophilic matrix, it does not literally infringe on Claim 1 of the '720 patent.

17.     Given the various infirmities in Shire's theory with respect to the structure and lipophilicity of the claimed inner lipophilic matrix, as well as its failure to demonstrate that magnesium stearate falls within the Markush group, they have failed to

---

[57] I have already found magnesium stearate to be lipophilic, so the second limitation would already be met.  (*See* FF ¶ 19.)

carry its burden of proving by a preponderance of the evidence that the Zydus ANDA product literally infringes Claim 1 of the '720 patent.

18.    Claim 3 of the '720 patent covers "[c]ompositions as claimed in claim 1, in the form of tablets, capsules, minitablets." Because this claim depends from Claim 1, and I have concluded that the Zydus ANDA product does not literally infringe Claim 1, I also conclude that it does not literally infringe Claim 3.

B.    *Doctrine of Equivalents*

19.    Shire argues that, even if the Zydus ANDA product does not literally infringe the '720 patent, it infringes under the doctrine of equivalents. "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002).

20.    Shire's doctrine of equivalents argument is essentially that magnesium stearate is equivalent to stearic acid, a compound which meets both requirements of the Claim 1(a) Markush group. That argument fails on two fronts. First, the evidence presented does not support a finding that magnesium stearate's melting point is equivalent to one below 90° C. "[A]n element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005). Here, the notion that a compound with a melting point *greater* than 90° C is equivalent to one with a melting point *less* than 90° C might well be

44

said to vitiate that claim term.  I acknowledge, however, that Federal Circuit precedent allows for some flexibility even in the face of a specified numeric value.

21.     The "proper inquiry" when assessing equivalence is "whether the accused [numeric] value is insubstantially different from the claimed value." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1293 (Fed. Cir. 2010).  Here, Shire has failed to show that magnesium stearate's melting point is "insubstantially different" from one below 90° C.  Having found that Shire did not prove a melting point below 90° C, the only melting point for magnesium stearate is the agreed-upon melting point of the anhydrous form at approximately 125° C.  (FF ¶¶ 55, 62, 64, 71.)  To hold that temperature to be "insubstantially different" from the temperature limitation in Claim 1 is a bridge too far, and is inconsistent with the limited wiggleroom the Federal Circuit has found in doctrine of equivalents cases involving numerical ranges.  *See, e.g., Adams Respiratory*, 616 F.3d at 1293 (finding that a value of 3493.38 units may be "insubstantially different" from a value of "at least 3500" as stated in the claim limitation); *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1170-71 (Fed. Cir. 2012) ("[A] tablet layer with 85% of the agent can be fairly characterized as an insubstantial change from a tablet layer with 90% of the agent.").

22.     I conclude that magnesium stearate's melting point is not, as a matter of law, "equivalent" to the claimed limitation, and that a finding to the contrary would vitiate the claim limitation.  The doctrine therefore does not apply.

23.     Even if I were to accept Shire's argument that magnesium stearate is equivalent to a Markush group member with a melting point below 90° C, however, that

conclusion would not alter the fact that the magnesium stearate in the Zydus ANDA product does not form a matrix, as concluded above. To credit Shire's doctrine of equivalents argument would require that I impermissibly read the matrix limitation out of the patent altogether. I cannot do so. Thus, Shire's doctrine of equivalents argument fails.

C.    *Induced and Contributory Infringement*

24.    Shire has propounded two additional theories of infringement liability as to Cadila specifically: that it is liable for induced infringement under 35 U.S.C. § 271(e)(2), and that it is liable for contributory infringement under 35 U.S.C. § 271(c).

25.    Both induced and contributory infringement require that there be an act of direct infringement by some party. *See Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304 (Fed. Cir. 2002) ("In order to succeed on a claim of inducement, the patentee must show ... that there has been direct infringement."); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010) ("To establish contributory infringement, the patent owner must show ... that there is direct infringement.")

26.    Because I have concluded that the Zydus product does not infringe the '720 patent, either literally or by the doctrine of equivalents, Shire's induced and contributory infringement arguments lack the necessary predicate, and therefore fail.

IV.    **SUMMARY OF CONCLUSIONS**

For the reasons set forth herein, the Zydus ANDA filing does not infringe Claims 1 or 3 of the '720 patent, either literally or under the doctrine of equivalents. Nor has Shire established any basis for secondary liability by Cadila. An appropriate order will follow.